**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**PIKEVILLE**

IN RE:

BLACK DIAMOND MINING COMPANY, LLC                    CASE NO. 08-70066

THE CIT GROUP/COMMERCIAL SERVICES, INC.                    PLAINTIFF

   v.                                                     ADV. NO. 08-7017

CONSTELLATION ENERGY COMMODITIES GROUP, INC.          DEFENDANTS
CONSTELLATION ENERGY GROUP, INC.

<u>OPINION</u>

This matter is before the court on cross-motions of the plaintiff, The CIT Group/Commercial Services, Inc., and the defendants, Constellation Energy Commodities Group, Inc., (Commodities), and Constellation Energy Group, Inc., (Constellation), for summary judgment.

The CIT Group/Commercial Services, Inc., a New York corporation, is a provider of domestic and international credit protection and factoring services,[1] accounts receivable management, asset-based lending and other financial services.

Defendant Constellation Energy Commodities Group, Inc., a Delaware corporation, is a participant in the domestic and international coal markets. Defendant Constellation Energy Group, Inc., a Maryland corporation, is a provider of energy to wholesale, commercial, governmental and industrial entities.

Commodities provides wholesale energy operations for Constellation, manages the coal supply for Constellation's power plants and also trades coal with other third parties. [Doc. 117,

---

[1]         Factoring is a financial transaction where a business sells its accounts receivable to a third party (called a factor) at a discount in exchange for immediate money with which to finance continued business operations. Factoring is one method by which a business may obtain needed cash when its available cash balances are insufficient to meet its current obligations.

Ex. 1,[2] Savage[3] Dep. at 6:8-8:9].  Constellation guaranteed Commodities' obligations under the first coal supply agreement dated May 9, 2006, between Debtor Black Diamond Mining Company, LLC and Commodities.  [Doc. 117, Ex. 2, Sergent Dep. at 184:6-186:6].

CIT Group served as Black Diamond's commercial factor.  The factoring arrangement with Black Diamond was CIT Group's first transaction involving the coal industry.  [Doc. 117, Ex. 3, Franklin[4] Dep. at 16:9-17:19, 28:20-29:1, 63:2-4].

CIT Group instituted this adversary proceeding seeking payment pursuant to certain invoices reflecting sales of coal from Black Diamond to Commodities and certain other charges. CIT Group alleges that its security interests in Black Diamond's inventory and accounts receivable afforded it the right to collect from Commodities and Constellation for funds advanced to Black Diamond pursuant to CIT Group's factoring arrangement with Black Diamond.  CIT Group contends Commodities converted coal sold to it by Black Diamond.  CIT Group also seeks recovery of funds paid by Commodities to Black Diamond pursuant to four amendments to the Coal Supply Agreement, dated May 9, 2006, having Reference No. BLJ07(TP)0004.

Both CIT Group and Commodities/Constellation move for summary judgment on all claims set forth in the Second Amended Complaint filed August 24, 2009.  [Doc. 93].

## FINDINGS OF FACT

During the fall of 2005, Black Diamond began looking for financing to purchase certain coal reserves located in Floyd County, Kentucky.  [Doc. 117, Ex. 2, Sergent Dep. at 89:15-90:92:12; Ex. 8 Nelson Dep. at 12:4-16:16; Ex. 3, Franklin Dep. at 20:4-19].

At or about that time, Black Diamond's CEO, Harold Sergent began negotiating a long-term coal supply agreement to sell coal to Commodities.  [Doc. 117, Ex. 2, Sergent Dep. at 89:15-90:92:12; Ex. 8 Nelson[5] Dep. at 12:4-16:16; Ex. 3, Franklin Dep. at 20:4-19].

---

[2]  All exhibits to Document 117 were filed under seal.  *See* Order at Doc. 135.
[3]  Chris Savage.
[4]  Robert W. Franklin was in-house legal counsel with CIT Group.

On May 9, 2006, following months of negotiation, Black Diamond and Commodities executed a coal supply agreement, the **May 2006 Coal Supply Agreement**, which set forth Black Diamond would sell approximately 2.55 million tons of coal to Commodities between July 1, 2006, and December 31, 2008, at a price of $50.00 per ton for 1% Coal, $54.52 per ton for Compliance Coal[6] shipped in 2007, and $55.00 per ton for Compliance Coal shipped in 2008. [Doc. 117, Ex. 9 at CIT0535; Ex. 2, Sergent Dep. at 10:19-11:20; Ex. 8, Nelson Dep. at 52:11-54:2].

CIT Group executives and counsel reviewed the terms of the **May 2006 Coal Supply Agreement** prior to its execution and prior to entering into a factoring arrangement with Black Diamond. [Doc. 117, Ex. 3, Franklin Dep. at 23:2-22; 26:4-24; Ex. 10, Hudgens[7] Dep. at 40:8-15; Ex. 11 at CIT 0723 – 0724]. CIT Group was provided copies of subsequent coal supply agreements between Black Diamond and Commodities. [Doc. 117, Ex. 12, Hegger[8] Dep. at 36:7-37:16.6].

At or about the same time it entered into the **May 2006 Coal Supply Agreement**, Black Diamond executed the **Factoring Agreement** with CIT Group, as well as long-term lending facilities with CIT Group's affiliate, CIT Capital. [Doc. 117, Ex. 13; Ex. 3, Franklin Dep. at 20:4-19; Ex. 14].

In May 2006, CIT Group received a security interest in Black Diamond's accounts receivables; no interest was granted in Black Diamond's inventory. [Doc. 117, Ex. 13 at CIT 0287; Ex. 15, Lew[9] Dep. at 37:12-25; Ex. 16, Funk[10] Dep. at 42:4-43:7].

---

[5]     Robert Nelson was employed by Constellation Energy Commodities Group, Inc.

[6]     "Compliance" coal is a specific type of coal meeting the requirement of emitting low amounts of sulfur dioxide when burned. "Compliance" coal is also commonly known as low sulfur coal.

[7]     Michael G. Hudgens was Senior Vice President for The CIT Group/Commercial Services, Inc.

[8]     David C. Hegger was Chief Financial Officer for Black Diamond.

[9]     Jeff Lew was Vice President for The CIT Group/Commercial Services, Inc.

[10]     Joseph E. Funk.

In addition to the **May 2006 Coal Supply Agreement**, Black Diamond and Commodities also entered into other **Coal Supply Agreements** and **Transaction Confirmations**, including agreements pursuant to which Black Diamond purchased significant tonnages of coal from Commodities, to help Black Diamond meet some of its delivery obligations.  [Doc. 117, Ex. 19].

The other **Coal Supply Agreements** involving coal purchases by Commodities from Black Diamond relevant to this dispute are:

- CSA Ref. No. BLJ07(TP)0010, dated October 15, 2007, in which Black Diamond agreed to sell 165,000 tons of coal to Commodities between November 1, 2007, and September 30, 2008, at a price of $41.00 per ton, [Doc. 158, E. Thompson[11] Aff., Ex. 10[12] at CONSTELLATION-0003783 – 3784; Doc. 117, Ex. 19];

- CSA Ref. No. BLJ08(TP)0002, dated September 13, 2007, in which Black Diamond agreed to sell 1.116 million tons of coal to Commodities between January 1, 2008, and December 31, 2009, at a price of $48.25 per ton of Coal shipped in 2008 and $52.00 per ton of Coal shipped in 2009, [Doc. 117, Ex. 6 at CONSTELLATION-0003836 – 3837; Ex. 19];

- CSA Ref. No. BLJ08(TP)0001, dated September 13, 2007, in which Black Diamond agreed to sell 1.2 million tons of coal to Commodities between January 1, 2008, and December 31, 2009, at a price of $46.70 per ton, [Doc. 158, E. Thompson Aff., Ex. 7 at CONSTELLATION-0003810 – 3811; Doc. 117, Ex. 19];

- CSA Ref. No. BLJ08(TP)0004, dated October 2, 2007, in which Black Diamond agreed to sell 480,000 tons of coal to Commodities between January 1, 2008, and December 31, 2008, at a price of $43.25 per ton, [Doc. 158, E. Thompson Aff., Ex. 9 at CONSTELLATION-0003862 – 3863; Doc. 117, Ex. 19]; and

- CSA Ref. No. BLJ07(TP)0009, dated October 1, 2007, in which Black Diamond agreed to sell 60,000 tons of coal to Commodities between October 1, 2007, and December 31, 2007, at a price of $42.50 per ton, [Doc. 158, E. Thompson Aff., Ex. 8 at CONSTELLATION-0004924 – 4925; Doc. 117, Ex. 19].

CIT Group and Commodities/Constellation agree while the **Coal Supply Agreements** contained different commercial terms (price, quantity and quality specifications), all of the **Coal Supply Agreements**, which includes the **May 2006 Coal Supply Agreement**, contained nearly identical "non-commercial" provisions concerning Events of Default, termination damages, recoupment of "liquidated damages" for missed deliveries, payment terms, credit terms, and

---

[11]    Elizabeth Lee Thompson is co-counsel of record for Constellation Energy Commodities Group, Inc. and Constellation Energy Group, Inc.

[12]    All exhibits to Document 158 were filed under seal.  *See* Order at Doc. 160.

omnibus provisions allowing for the netting, recoupment and setoff of payment obligations.

[Doc. 120, P. Thompson[13] Aff. at ¶ 4; Doc. 119, Amato[14] Decl. at ¶ 28].

The **Coal Supply Agreements** provided when an Event of Default occurred, the non-Defaulting Party could either suspend performance, or establish by written notice to the Defaulting Party, a date on which the agreement would terminate early.

EVENTS OF DEFAULT AND REMEDIES.

(b)  Upon the occurrence of an Event of Default, the non-Defaulting Party may, for so long as such Event of Default is continuing, (A) suspend performance of its obligations under the [sic] this Agreement until such Event of Default is cured (provided, however, that in no event shall any withholding of payment or suspension of performance under this Section 12(b) continue for longer than sixty (60) days unless an Early Termination Date shall have been declared and written notice thereof given pursuant to this Section 12(b) and/or (B) establish by written notice to the Defaulting Party a date (which shall be no earlier than the day such notice is effective and no later than twenty (20) days after the date of such notice) on which this Agreement shall terminate early (the "Early Termination Date"), and the non-Defaulting Party shall calculate its Gains, Losses and Costs resulting from the termination of this Agreement.  The Gains, Losses and Costs shall be determined by comparing the value of the remaining Term, Quantities and Price applicable to the termination of this Agreement had it not been terminated to the equivalent quantities and relevant market prices for the remaining Term either quoted by a bona fide third-party or which are reasonably expected to be available in the market to a replace the terminated Agreement.  The non-Defaulting Party shall aggregate such Gains, Losses and Costs with respect to this Agreement into a single net amount ("the Termination Payment") and notify the Defaulting Party of such amount.  If the non-Defaulting Party's aggregate Losses and Costs exceed its aggregate Gains, the Defaulting Party shall, within five (5) days of receipt of such notice, pay the net amount to the non-Defaulting Party, which amount shall bear interest at the Interest Rate from the Early Termination Date until paid.  If the non-Defaulting Party's aggregate Gains exceed its aggregate Losses and Costs, if any, resulting from the termination of the terminated Agreement, the non-Defaulting Party, shall, within twenty (20) Business Days of the Early Termination Date, pay the net amount (without interest) to the Defaulting Party; provided, however, that notwithstanding any provision to the contrary contained in this Agreement, the non-Defaulting Party may withhold any payment otherwise owed to the Defaulting Party hereunder, until the non-Defaulting Party receives confirmation satisfactory to it in its reasonable discretion that (i) all amounts due and payable as of the Early Termination Date by the Defaulting Party or any of its affiliates … under all transactions with the non-Defaulting Party or any of its affiliates … have been fully and finally paid, and (ii) all other obligations of any kind whatsoever of the Defaulting Party or any of its affiliates  … to the non-Defaulting Party or any

---

13    Peter Thompson was Senior Counsel at Constellation Energy Commodities Group, Inc.
14    John P. Amato is co-counsel of record for The CIT Group/Commercial Services, Inc.

> of its affiliates … under this Agreement or otherwise which are due as of the
> Early Termination Date have been fully and finally performed.  In no event shall a
> Party's Gains, Losses or Costs include any penalties or similar charges.

[Doc. 117, Ex. 9 at CIT0548].

If the non-Defaulting Party chose to terminate, it would then calculate a Termination Payment, representing the "single net amount" due between the parties in respect of the terminated agreement and determined by comparing the price(s) specified in the relevant agreement for the remaining term and quantity covered by such agreement to the market price for such remaining term and quantity.  If the price(s) specified in the agreement were less than the relevant market price, the buyer under the agreement would incur a loss as a result of the termination and would be entitled to receive a Termination Payment determined by reference to such loss and any costs incurred by the non-Defaulting Party in connection with the termination. Conversely, if the price(s) specified in the agreement were greater than the relevant market price, the buyer under the agreement would realize a gain and the seller under the agreement would be owed a Termination Payment determined by reference to such gain and any costs incurred by the non-Defaulting Party in connection with the termination.  [Doc. 117, Ex. 9 at CIT0546 – 0549].

The **Coal Supply Agreements** include more than thirteen Events of Default, such as the failure to pay amounts when due or becoming subject to a bankruptcy proceeding:

> 12. … the occurrence of one or more of the following events with respect
> to a Party (the "Defaulting Party") shall constitute an "Event of Default":
>
> …
>
> (viii) the Party (A) files a petition for bankruptcy, (B) has a petition in
> bankruptcy filed against it and such petition is not withdrawn or dismissed
> within thirty (30) days after such filing, (C) becomes otherwise insolvent or
> unable to pay its debts as they become due…

 [Doc. 117, Ex. 9 at CIT0546 – 0547].

Black Diamond defaulted under the terms of **Coal Supply Agreements**.  [Doc. 117, Ex. 47 at CIT 0891, CIT 0900].

Each of the **Coal Supply Agreements** contained a **Netting and Set-off Provision** allowing Black Diamond and Commodities to net, recoup or set off payment obligations between the parties, whether on a single agreement or as between the various **Coal Supply Agreements**:

> 16. … The Parties hereby agree that they shall discharge mutual debts and payment obligations due and owing to each other on the same date or in the same month in respect of this Agreement and any other transaction between the Parties in the same Commodity through netting.  All amounts owed by each Party to the other Party, including any related liquidated damages, interest, or other amounts, shall be netted so that only the net difference between such amounts shall be payable by the Party who owes the greater amount.  Each Party reserves to itself all rights, setoffs, counterclaims, combination of accounts, liens and other remedies and defenses which such Party has or may be entitled to (whether by operation of law or otherwise).  All payment obligations hereunder and under any transaction between the Parties in the same Commodity may be offset against each other, set off or recouped.

[Doc. 117, Ex. 9 at CIT0550].  This provision allowed Commodities and Black Diamond to set off, net, or recoup all payment obligations under the agreement and "under any transaction between the Parties" in the same Commodity.  Similarly, this provision allowed Commodities to net any liquidated damages against other amounts owed by Commodities to Black Diamond. [*See also* Doc. 120, P. Thompson Aff. at ¶ 12].

CIT Group was aware of the **Netting and Set-off Provision** prior to the execution of the **May 2006 Coal Supply Agreement**.  CIT Group's general counsel expressed concerns to other senior executives at CIT Group and its outside counsel, as well as to others with Black Diamond, that the **Netting and Set-off Provision** could dilute CIT Group's rights under the **Factoring Agreement** if Black Diamond were to default.  [Doc. 117, Ex. 22 at CIT 1752, 1754, 1891 – 1892; Ex. 3, Franklin Dep. at 63:10-65:14, 68:12-69:13, 70:9-71:1, 74:13-75:14, 81:14-83:18].  The evidence of record shows CIT Group did not object to representatives of either Black Diamond or Commodities regarding the inclusion of the **Netting and Set-off Provision** in the executed **May 2006 Coal Supply Agreement**.  [Doc. 117, Ex. 12, Hegger Dep. at 36:7-37:16].

7

Each of the other relevant **Coal Supply Agreements** all contained an identical provision, and the evidence shows CIT Group never objected to the inclusion of this provision in any of the other **Coal Supply Agreements** entered into by Black Diamond and Commodities. [Doc. 117, Ex. 12, Hegger Dep. at 36:7-37:16; Doc. 119, Amato Decl. at ¶ 28].

There were other important provisions in the **Coal Supply Agreements** between Black Diamond and Commodities.

First, both Commodities and Black Diamond agreed all coal sold by Black Diamond to Commodities would be free of any liens, encumbrances and claims, such as a security interest.

> 10. … Seller warrants that it will transfer to Buyer good title to the Commodity to be delivered hereunder, that it has the right to sell such Commodity to Buyer, that such commodity shall be free from all liens, encumbrances and claims.

[Doc. 117, Ex. 9 at CIT0544].

This provision precluded Black Diamond from entering into any agreement or arrangement whereby a third party could claim a lien – such as an inventory security interest – on the coal sold to Commodities by Black Diamond.[15]

Pursuant to the **May 2006 Coal Supply Agreement** and the other **Coal Supply Agreements**, Commodities and Black Diamond agreed to extended payment and credit terms for the coal purchased by Commodities from Black Diamond.

> (b) … Such payment shall be made on or before the earlier of the thirtieth (30th) day of the month following Shipment, or tenth (10th) day after receipt of the

---

[15]   This provision appears a critical part of Commodities' agreements with Black Diamond given that some of the coal purchased by Commodities was then resold to downstream counterparties. [Doc. 117, Ex. 23 at Article 3.4].

Commodities makes the same representation - the coal it is selling is free and clear of any lien, encumbrances or claim – in its downstream contracts. [Doc. 120, First P. Thompson Aff. at ¶ 7(d)]. Such representations were also in coal supply agreements in which Commodities sold coal to Black Diamond. [Doc. 157, P. Thompson Aff. at ¶¶ 4, 10(d)].

Additionally, such representations are standard industry practice and coal is generally not sold subject to any encumbrances or liens. [Doc. 117, Ex. 24, Mullins Dep. at 17:10-23; Ex. 2, Sergent Dep. at 123:2-4; Ex. 12, Hegger Dep. at 43:17-22].

Black Diamond's CEO, Mr. Sergent, and CFO, Mr. Hegger, testified standard industry practice was to sell coal free and clear of any liens or encumbrances. *Id.* Both also testified they believed the coal delivered to Commodities pursuant to the **Coal Supply Agreements**, including the coal sold pursuant to the invoices at issue, was sold free of any encumbrances and liens. *Id.*

invoice or, if such day is not a Business Day, then on the next following Business Day; _provided however_, that Buyer has the right to and may withhold any or all payments due to Seller with regard to each Delivered Monthly Shipment Payment for a duration of (x) up to ninety (90) days for trains loaded during the first twelve (12) months of this Agreement and (y) up to sixty (60) days for trains loaded thereafter from receipt of the invoice for such Delivered Monthly Shipment Payment(s) … _provided further_, that if an Event of Default has occurred and is continuing with respect to the Seller, Buyer may continue to hold such Withheld Payments beyond the applicable sixty (60) or ninety (90) day period, … until the Event of Default is no longer occurring or until any termination of this Agreement.

[Doc. 117, Ex. 9 at CIT0540 – 0541, (Emphasis in original)].

The **May 2006 Coal Supply Agreement**, quoted above, allowed Commodities to withhold payment on an invoice for up to ninety days during the first year, and for up to sixty days on invoices received during the balance of the period governed by the **May 2006 Coal Supply Agreement**.  [Doc. 117, Ex. 8, Nelson Dep. at 79:6-80:9; Ex. 12, Hegger Dep. at 25:5-26:22].  Commodities could also withhold payment following an Event of Default beyond the ninety or sixty day due date.  [Doc. 117, Ex. 9 at CIT0540 – 0541].

CIT Group was aware of these payment terms at the time of the execution of the **May 2006 Coal Supply Agreement**.  [Doc. 117, Ex. 3, Franklin Dep. at 26:4-23, 84:11-86:10].

The delivery terms in the **May 2006 Coal Supply Agreement** and other **Coal Supply Agreements** included "FOB railcar" or "FOB truck" delivery terms.

FOB railcar on the CSX railroad in the Big Sandy district, capable of loading 100 car/10,000 Ton unit trains in four (4) hours or less.

[Doc. 117, Ex. 9 at CIT0536; Doc. 158, E. Thompson Aff., Ex. 9 at CONSTELLATION-0003862]. Once Black Diamond delivered coal to a railcar or truck, title to the coal transferred to Commodities.  [Doc. 117, Ex. 9 at CIT0536; Ex. 23 at Article 3.3(a)].

The **Coal Supply Agreements** contained a liquidated damages clause requiring the seller to pay for missed deliveries, or to have that amount netted out against other deliveries.

(a) … if Seller fails to deliver all or part of the quantity of Commodity to be delivered hereunder, Seller shall pay Buyer for each Ton of such deficiency (the "Deficiency") an amount equal to the positive difference, if any, obtained by subtracting the Price for the Deficiency from the Replacement Price ("Buyer's Damages").  "Replacement Price" means the price at which Buyer, acting in a

> commercially reasonable manner, purchases substitute Commodity for the
> Deficiency … or, absent such a purchase, the market price for such quantity of
> Commodity (F.O.B., Delivery Point) at the time of the breach, as determined by
> Buyer in a commercially reasonable manner.  It is expressly agreed that Buyer
> shall not be required to enter into a replacement transaction in order to determine
> the Replacement Price.  Seller shall make any payment owed to Buyer pursuant
> to this clause (a) within five (5) days after receipt of written notice from Buyer
> requesting payment of such amount.

[Doc. 117, Ex. 9 at CIT0549].   This provision provided that Commodities could calculate

liquidated damages without having to enter into a specific replacement transaction to purchase

substitute coal.  This term further provided a recoupment remedy for Commodities against Black

Diamond for any missed deliveries.

Each of the **Coal Supply Agreements** also contained a representation stating that each

party is "a 'forward contract merchant' and this Agreement hereunder is a 'forward contract'

within the meaning of the United States Bankruptcy Code."  [Doc. 117, Ex. 9 at CIT0554].

The various **Coal Supply Agreements** around which the disputes herein arise are

governed by the law of the State of New York.  [Doc. 117, Ex. 9 at CIT0553].

On May 9, 2006, Constellation executed a **Guaranty Agreement** in favor of Black

Diamond pursuant to which Constellation guaranteed the prompt payment to Black Diamond of

all sums due or to become due under the **May 2006 Coal Supply Agreement**.  [Doc. 117,

Ex. 18].

Also on May 9, 2006, Black Diamond, Commodities and the Bank of New York as

Collateral Agent, executed a **Consent Agreement**, which specifically preserved Commodities'

right to recoupment, set-off and other defenses as established in the **May 2006 Coal Supply

Agreement**.  [Doc. 117, Ex. 17 at CIT0308; Ex. 1, Savage Dep. at 58:17-60:21; Ex. 3, Franklin

Dep. at 114:4-25].  Specifically, the **Consent Agreement** set forth:

> 5. … [Commodities] hereby irrevocably agrees that from and after the
> date hereof all payments to be made by it to [Black Diamond] under the
> Agreements shall be made in immediately available funds, without
> deduction, setoff or counterclaim, except as otherwise provided in the
> Agreements…

[Doc. 117, Ex. 17 at CIT0308].

CIT Group received a copy of the **Consent Agreement** on or about the time that it was executed by Commodities and Black Diamond.   [Doc. 117, Ex. 3, Franklin Dep. at 107:14-111:1].

In three different email messages directed to other CIT Group executives, outside counsel, as well as, Black Diamond executives, Robert Franklin, CIT Group's general counsel, demonstrated an understanding of the impact of Commodities' potential recoupment and set-off rights and expressed concern that such rights could eliminate amounts to be paid to CIT Group.

For example, in a message dated April 14, 2006, Mr. Franklin stated:

> I have looked at the draft [Sempra] and Constellation.  There are some pretty broad offset rights; however, at least in some instances there are limits on damages.  We will need to get comfortable with the offset rights and understand how the contracts work so that we can understand the risk that a large block of accounts could suddenly disappear if BD breaches one of these contracts.  Any chance [Sempra] and Constellation would agree to limit their rights to setoff against CITCMS?  I would guess not but it cannot hurt to ask.

[Doc. 117, Ex. 22 at CIT 1752].

In message sent later that same day, April 14, 2006, Mr. Franklin reiterated:

> I have briefly reviewed the Constellation and the [Sempra] contracts and we will need to get our arms around the rights of these parties to offset outstanding accounts for breaches of these contracts.  A breach of the contracts, could cause all of those accounts receivable to disappear if the customer effects an off set.

[Doc. 117, Ex. 22 at CIT 1754].

On May 3, 2006, Mr. Franklin again outlined his concerns relating to the rights Commodities had under the **Netting and Set-off Provision**:

> Additionally, I have indicated to them the multiple places that disputes and deductions can occur.  My greatest fear is that the Constellation contract goes into default and all the Constellation A/R disappears through a setoff by Constellation.  If we have loaned against that A/R we are in trouble and will only have the excess amounts due on other accounts over what we have advanced thereon to make up the hole.  That could be a real problem since Constellation is so big.  They just need to get their arms around the issues.  I guess if the Constellation

contract is in breach, the whole deal is in the ditch; however, our problem
we only have limited collateral.

[Doc. 117, Ex. 22 at CIT 1891 – 1892].

Section 2 of the **Consent Agreement** sets forth Commodities' acknowledged notice of
CIT Group's security interest, which in May 2006 was solely in Black Diamond's accounts
receivable, concerning any sales of coal inventory that were factored by CIT Group.  [Doc. 117,
Ex. 17 at CIT0306].

The **Consent Agreement** also directed payments from Commodities should be
deposited into a bank account with the Bank of New York, labeled the "Corporate Trust Agency,
Ref: Black Diamond Proceeds Account," bearing account number GLA-111-565.  [Doc. 117, Ex.
17 at CIT0308 – 0309; Ex. 3, Franklin Dep. at 115:2-19].[16]

On May 11, 2006, two days after execution of the **May 2006 Coal Supply Agreement**
and the **Consent Agreement**, Black Diamond and CIT Group executed a **Factoring
Agreement** which granted CIT Group a security interest in Black Diamond's accounts
receivable.  The **Factoring Agreement** did not grant a security interest in Black Diamond's
inventory.  [Doc. 117, Ex. 13 at CIT0287; Ex. 3, Franklin Dep. at 50:13-51:15].

Under the terms of the **Factoring Agreement**, Black Diamond agreed to "sell and
assign to [CIT Group] … all accounts arising from your sales of coal inventory … (collectively,
the '**Accounts**' and individually, an '**Account**')."  [Doc. 117, Ex. 13 at CIT0282].  The **Factoring
Agreement** set forth that "each **Account** is based upon a bona fide sale and delivery of coal
inventory made by you in the ordinary course of business…" [Doc. 117, Ex. 13 at CIT0283].
Accordingly, the **Factoring Agreement** did not allow Black Diamond to factor all receivables
with CIT Group, but only those sales made in the ordinary course of Black Diamond's business.

---

[16]    CIT Group's General Counsel, Robert Franklin, testified that this account was included in
the **Consent Agreement** in error, but the evidence of record establishes the **Consent Agreement** was
never amended to include a different account.  [Doc. 117, Ex. 3, Franklin Dep. at 116:6-117:14; Ex. 3,
Franklin Dep. at 118:8-10; Doc. 120, P. Thompson Aff. at ¶ 11.]

The **Factoring Agreement** also explicitly authorized the factoring of receivables generated from the sales of coal made by Black Diamond to Commodities, and originally provided that Commodities invoices could comprise up to 50% of the invoices factored by Black Diamond.  [Doc. 117, Ex. 13 at CIT0284].   Later, Black Diamond requested, and CIT Group agreed, Commodities invoices could comprise up to 70% of the invoices factored by CIT Group for Black Diamond.  [Doc. 117, Ex. 28 at CIT0333].

By October 2006, Black Diamond was in default under its various financing agreements with CIT Capital and CIT Group for, among other issues, failing to meet its minimum mining production requirement of 188,000 tons of coal per month.  [Doc. 117, Ex. 29 at CIT 1189; Ex. 2, Sergent Dep. at 93:15-94:15; Ex. 15, Lew Dep. at 38:9-39:10; Ex. 3, Franklin Dep. at 95:2-10].   Despite this default and numerous other defaults that occurred throughout the course of the CIT Group/Black Diamond relationship, CIT Group continued to advance money to Black Diamond, and issued subsequent waivers of default.  [Doc. 117, Ex. 15, Lew Dep. at 39:19-40:4; Ex. 3, Franklin Dep. at 96:2-9, 129:4-12; Ex. 2, Sergent Dep. at 93:15-95:12].

In late November 2006, in consideration for waiver of certain defaults, Black Diamond agreed to provide CIT Group with a security interest in Black Diamond's inventory, including its coal reserves, pursuant to an agreement entitled the **Credit and Inventory Security Agreement**, dated November 22, 2006.  [Doc. 117, Ex. 30; Ex. 15, Lew Dep. at 42:4-43:19; Ex. 3, Franklin Dep. at 122:21-123:15, 128:20-24, 129:13-130:7].

Like the **Factoring Agreement**, the **Credit and Inventory Security Agreement** authorized sales of coal in the regular course of Black Diamond's business:

> 5.1 [Black Diamond and its affiliates] agree to safeguard, protect and hold all Inventory for our account and make no disposition thereof except in the regular course of your business as herein provided.  [Black Diamond and its affiliates] represent and warrant that Inventory will be sold and shipped by [them] to their customers only in the ordinary course of your business…

[Doc. 117, Ex. 30 at CIT0571].

Additionally, under the terms of the **Credit and Inventory Security Agreement**, Black Diamond was required to assign all invoices to CIT Group in accordance with the terms of the **Factoring Agreement**.  [Doc. 117, Ex. 30 at CIT0571].

Neither CIT Group nor Black Diamond ever forwarded a copy of the **Credit and Inventory Security Agreement** to Commodities (or Constellation), nor did either advise Commodities (or Constellation) of its existence.  [Doc. 117, Ex. 8, Nelson Dep. at 43:16-20; Ex. 3, Franklin Dep. at 133:11-15; Ex. 2, Sergent Dep. at 138:20-25; Doc. 120, P. Thompson Aff. at ¶ 11].  Commodities also never executed a new consent agreement relating to the **Credit and Inventory Security Agreement**, nor was it ever asked to do so.  [Doc. 117, Ex. 12, Hegger Dep. at 94:10-13; Ex. 2, Sergent Dep. at 139:9-16; Ex. 16, Funk Dep. at 81:17-82:2].  Nor did Black Diamond and CIT Group ever amend the **Factoring Agreement** or the **Consent Agreement** with Commodities to reflect the existence of the **Credit and Inventory Security Agreement**.  [Doc. 117, Ex. 3, Franklin Dep. at 141:25-143:22, 157:15-20; Ex. 2, Sergent Dep. at 139:9-16; Doc. 120, P. Thompson Aff. at ¶ 11].

Black Diamond shipped, and Commodities acquired coal pursuant to numerous shipments between December 16, 2007, and February 4, 2008.  These shipments are reflected in the **Invoices** which are the subject matter of this dispute, and set forth in the following chart:

| Black Diamond Invoice # | Coal Supply Agreement # | Trade ID | Date | Price | Quantity | Invoice Amount |
|---|---|---|---|---|---|---|
| #1-001192 | BLJ08(TP)0004 | CLP0A16 | 1/3/2008 | $ 43.25 | 10,872.70 | $ (473,146.21) |
| #1-001208 | BLJ07(TP)0013 | CLP0A5O | 1/8/2008 | $ 46.50 | 10,573.28 | $ (486,307.21) |
| #1-001209 | BLJ08(TP)0001 | CLP08ZU | 1/8/2008 | $ 46.70 | 10,194.50 | $ (483,392.61) |
| #1-001211 | BLJ08(TP)0002 | CLP09VH | 1/9/2008 | $ 48.25 | 8,019.11 | $ (392,760.31) |
| #1-001212 | BLJ08(TP)0004 | CLP0A16 | 1/10/2008 | $ 43.25 | 11,416.23 | $ (493,751.73) |
| #1-001213 | BLJ08(TP)0001 | CLP08ZU | 1/11/2008 | $ 46.70 | 10,887.45 | $ (512,102.10) |
| #1-001217 | BLJ08(TP)0004 | CLP0A16 | 1/16/2008 | $ 43.25 | 11,329.35 | $ (505,832.82) |
| #1-001226 | BLJ08(TP)0001 | CLP08ZU | 1/17/2008 | $ 46.70 | 3,038.95 | $ (142,010.14) |
| #1-001230 | BLJ07(TP)0010 | CLP0A1E | 1/22/2008 | $ 41.00 | 7,568.90 | $ (310,324.90) |
| #1-001234 | BLJ08(TP)0002 | CLP09VH | 1/28/2008 | $ 48.25 | 8,695.37 | $ (429,620.07) |
| #1-001237 | BLJ08(TP)0002 | CLP09VH | 1/29/2008 | $ 48.25 | 8,486.83 | $ (420,649.09) |
| #1-001238 | BLJ07(TP)0010 | CLP0A1E | 1/29/2008 | $ 41.00 | 7,457.85 | $ (305,771.85) |
| #1-001239 | BLJ08(TP)0004 | CLP0A16 | 1/29/2008 | $ 43.25 | 11,199.20 | $ (474,756.49) |

| #1-001242 | BLJ08(TP)0002 | CLP09VH | 1/30/2008 | $ 48.25 | 3,547.65 | $ (172,105.97) |
| #11-001108 | BLJ07(TS)0007 | CLS09W1 | 11/30/2007 | N/A | N/A | $ (2,035.82) |
| #12-001129 | BLJ07(TP)0009 | CLP0A08 | 12/13/2007 | $ 42.50 | 10,784.28 | $ (457,598.36) |
| #12-001131 | BLJ07(TP)0010 | CLP0A1E | 12/16/2007 | $ 41.00 | 7,593.75 | $ (311,343.75) |
| #12-001154 | BLJ07(TP)0014 | CLP0A6L | 12/22/2007 | $ 51.00 | 2,317.33 | $ (117,532.66) |
| #12-001156 | BLJ07(TP)0014 | CLP0A6L | 12/22/2007 | $ 51.00 | 2,558.49 | $ (129,764.05) |
| #12-001157 | BLJ07(TP)0014 | CLP0A6L | 12/22/2007 | $ 51.00 | 190.53 | $ (9,663.49) |
| #12-001158 | BLJ07(TP)0014 | CLP0A6L | 12/22/2007 | $ 51.00 | 261.52 | $ (13,264.03) |
| #12-001159 | BLJ07(TP)0014 | CLP0A6L | 12/22/2007 | $ 51.00 | 387.49 | $ (19,653.11) |
| #12-001160 | BLJ07(TP)0014 | CLP0A6L | 12/22/2007 | $ 51.00 | 1,919.21 | $ (97,340.41) |
| #12-001155 | BLJ07(TP)0014 | CLP0A6L | 12/22/2007 | $ 51.00 | 592.10 | $ (30,030.72) |
| #1-001233 | BLJ08(TP)0002 | CLP09VH | 1/24/2008 | $ 48.25 | 8,838.70 | $ (425,704.48) |
| #2-001246 | BLJ08(TP)0004 | CLP0A16 | 2/1/2008 | $ 43.25 | 11,014.73 | $ (487,280.42) |
| #2-001248 | BLJ08(TP)0002 | CLP09VH | 2/4/2008 | $ 48.25 | 8,740.23 | $ (417,330.72) |
| | | | | | **Total for Invoices** | **$ (8,121,073.52)** |

[Doc. 117, Ex. 7 at CONSTELLATION-0005425]. The **Invoices** total $8,121,073.52.

One invoice, #11-001108, reflected a $2,035.82 minimum weight charge relating to a shipment of coal sold by Commodities to Black Diamond, and not a delivery of coal from Black Diamond to Commodities. [Doc. 117, Ex. 26 at CONSTELLATION-0004827; Doc. 156, Second Hoskins[17] Aff. at ¶ 12].

In addition, there were five **Uninvoiced Deliveries** of coal acquired by Commodities from Black Diamond, which were shipped by Black Diamond to Commodities on January 5, 2008, January 16, 2008, January 25, 2008, and February 5, 2008. [Doc. 117, Ex. 7 at CONSTELLATION-0005426; Doc. 156, Second Hoskins Aff. at ¶¶ 15, 16]. These shipments are reflected in the following charts:

| Coal Supply Agreement # | Barge ID | Sec DB | Load Date | Pricing Provision | Quantity | Per Unit Value | Total Value |
| --- | --- | --- | --- | --- | --- | --- | --- |
| BLJ08(TP)0002 | OR4793 | CLP09VH | 2/5/2008 | Fixed Price, BTU Adjust, Big Sandy Discount | 1,792.97 | $ 48.250 | $ (88,422.11) |
| BLJ08(TP)0002 | T13540 | CLP09VH | 2/5/2008 | Fixed Price, BTU Adjust, Big Sandy Discount | 1,819.57 | $ 48.250 | $ (88,438.38) |

---

[17]     Phillip Hoskins was employed by Constellation Energy Commodities Group, Inc. as a rail scheduler for CSX Rail coal trains.

| | | | | | | Total Uninvoiced Amount for BLJ08(TP)0002 | | $ (176,860.49) |
|---|---|---|---|---|---|---|---|---|

| Coal Supply Agreement # | Train ID | Sec DB | | Pricing Provision | Quantity | Per Unit Value | Total Value |
|---|---|---|---|---|---|---|---|
| BLJ07(TP)0004 | C 591 | CLP086O | 1/5/2008 | Fixed Price, BTU Adjust | 11,073.55 | $ 50.00 | $ (521,697.09) |
| BLJ07(TP)0004 | C 593 | CLP086O | 1/16/2008 | Fixed Price, BTU Adjust | 11,143.68 | $ 50.00 | $ (567,324.75) |
| BLJ07(TP)0004 | C 594 | CLP086O | 1/25/2008 | Fixed Price, BTU Adjust | 11,926.33 | $ 50.00 | $ (591,593.67) |
| | | | | **Total Uninvoiced Amount for BLJ07(TP)0004** | | | **$ (1,680,615.51)** |

[Doc. 117, Ex. 7 at CONSTELLATION-0005426].

Collectively, the **Invoices**, and the amounts of the **Uninvoiced Deliveries** total $9,978,549.52.  [Doc. 117, Ex. 7 at CONSTELLATION-0005422].

Pursuant to the **Factoring Agreement**, Black Diamond submitted invoices to CIT Group for review.  [Doc. 117, Ex. 15, Lew Dep. at 27:3-30:1; Ex. 12, Hegger Dep. at 21:25-22:21, 39:1-25].   The invoices were reviewed by Jeff Lew, CIT Group's Vice-President who was primarily responsible for determining whether advances would issue against a given invoice.  [Doc. 117, Ex. 15, Lew Dep. at 27:3-30:1; Ex. 12, Hegger Dep. at 75:10-24].   In particular, Mr. Lew would review an invoice "to be sure that there were no other sales that were not in the what we call the ordinary course of business, such as representing coal shipments or other irregularities that may come up in the invoices that I may determine that it should not qualify for advance purposes."  [Doc. 117, Ex. 15, Lew Dep. at 29:4-9].   Once a determination was made whether an advance would issue on a given invoice, Mr. Lew conveyed the determination to Black Diamond.  [Doc. 117, Lew Dep. at 29:21-30:1].

CIT Group authorized and approved for factoring purposes each of the **Invoices** at issue in this action, and CIT Group approved and issued advances in accordance with the terms of the **Factoring Agreement**.  [Doc. 117, Ex. 13 at CIT0284; Ex. 32 at CMS0158].     Thus,

according to CIT Group's determination, each of the **Invoices** reflected a sale of coal made in the ordinary course of Black Diamond's business.  [Doc. 117, Ex. 15, Lew Dep. at 29:5-9].

Twenty-six of the **Invoices** reflected a sale of coal delivered by Black Diamond to Commodities for which Commodities took title to the coal prior to the filing of the involuntary petition under Chapter 11 for Black Diamond and prior to the date that Commodities notified Black Diamond of an Event of Default under each **Coal Supply Agreement**.  Each of the twenty-six **Invoices** reflected a sale of coal delivered by Black Diamond to Commodities and for which Commodities took title to the coal prior to the date that Commodities terminated the **Coal Supply Agreements** and incurred **Termination Damages**.  [Doc. 117, Ex. 26].

Throughout the entire period between December 16, 2007, and February 4, 2008, Black Diamond sent invoices to CIT Group for factoring, and CIT Group never rejected a Commodities invoice for factoring purposes.  [Doc. 117, Ex. 32].

Black Diamond also purchased coal from Commodities. [Doc. 117, Ex. 24, Mullins[18] Dep. at 19:7-20:2; Ex. 16, Funk Dep. at 30:8-13, 109:7-13; Ex. 12, Hegger Dep. at 156:12-25]. Such transactions were subject to the **Netting and Set-off Provisions** of the **Coal Supply Agreements**, as described above.[19]  [Doc. 117, Ex. 9 at CIT0550].

CIT Group knew about and consented to the routine netting and setting off of delivery obligations between Commodities and Black Diamond through the practice of "bookouts."  [Doc. 117, Ex. 15, Lew Dep. at 115:20-121:9; Ex. 35 at CIT 5811-CIT 5812; Ex. 1, Savage Dep. at 58:17-60:21; Ex. 16, Funk Dep. at 70:6-16].   Bookouts represent the financial settlement of offsetting physical delivery obligations between parties to a specific coal supply agreement. [Doc. 117, Ex. 1, Savage Dep. at 24:12-33:6 (explaining bookouts)].   Bookouts eliminate both the need for physical performance for a specific shipment and all the inherent risks.  *Id.*

---

[18]    Carl E. Mullins.

[19]    *See* Doc. 117, Ex. 33 for invoices generated for coal sold by Commodities to Black Diamond, and Ex. 34 for invoices reflecting the netting and setoff of these transactions through bookouts.

Commodities and Black Diamond set off physical delivery obligations between the various **Coal Supply Agreements**. CIT Group not only consented to, but in certain instances agreed to, factor invoices when Black Diamond was owed funds from Commodities as a result of a bookout. [Doc. 117, Ex. 15, Lew Dep. at 120:4-121:9]. In particular, Mr. Lew consented to numerous bookout transactions between the parties on CIT Group's behalf. Doc. 117, Ex. 1, Savage Dep. at 24:12-27:14; Ex. 21, Hoskins Dep. at 42:14-51:9, Ex. 15, Lew Dep. at 120:4-121:9]. As Mr. Lew testified, on numerous occasions CIT Group confirmed bookout invoices with Commodities and then advanced funds to CIT Group pursuant to the **Factoring Agreement**. [Doc. 117, Ex. 35 at CIT 5811 – 5812]. CIT Group never charged Black Diamond's account for factoring of setoffs or bookouts where there was no physical payment of an invoice by Commodities. [Doc. 117, Ex. 12, Hegger Dep. at 60:15-19].

Invoices reflecting bookouts, which resulted in net amounts totaling $1,604,000 due to Commodities from Black Diamond for the months of January and February 2008 remain unpaid by Black Diamond from the time of Black Diamond's Chapter 11 filing. [Doc. 117, Ex. 34 at CONSTELLATION-0005401-0005402].

Mr. Sergent approached Commodities on numerous occasions with requests to improve Black Diamond's working capital and modify the types of coal Black Diamond was required to deliver to Commodities. [Doc. 117, Ex. 2, Sergent Dep. at 16:22-17:22, 21:3-22:21, 28:17-29:12, 30:11-31:11, 50:21-51:22, 158:6-159:2, 165:10-23,166:8-168:24, 168:25-170:1; Ex. 8, Nelson Dep. at 91:4-92:15; Ex. 1, Savage Dep. at 82:18-84:5; Ex. 12, Hegger Dep. at 44:8-45:1; Ex. 24, Mullins Dep. at 43:25-44:4]. As a result of these discussions, Commodities and Black Diamond entered into four amendments to the **May 2006 Coal Supply Agreement**. The first and second amendments were executed in October and November 2006, respectively. The third and fourth amendments in July and August 2007, respectively. [Doc. 117, Exs. 37, 38, 39, 40]. Each of these amendments was provided to CIT Group's affiliate, CIT Capital, who

was aware of each agreement's respective terms.  [Doc. 117, Ex. 2, Sergent Dep. at 117:14-118:25, 160:19-161:6, 170:2-10].

Furthermore, the evidence of record demonstrates no coal was sold to Commodities in exchange for the payments made pursuant to the Amendments, no invoices were generated and CIT Group made no advances or extensions of credit to Black Diamond in connection with these amendments.  [Doc. 117, Exs. 37, 38, 39, 40].

On October 23, 2006, Commodities and Black Diamond executed **Amendment No. 1** to the **May 2006 Coal Supply Agreement**, which reduced the price for compliance coal Black Diamond was required to deliver during calendar year 2007 from $54.52 per ton to $51.25 per ton.  [Doc. 117, Ex. 37; Ex. 2, Sergent Dep. at 17:8-17].  As consideration for the price reduction, Commodities paid Black Diamond 1.5 million dollars.  [Doc. 117, Ex. 37; Ex. 12, Hegger Dep. at 45:2-17].  Both Black Diamond and Commodities received a benefit from this **Amendment No. 1** – Black Diamond increased its immediate working capital and Commodities received a future benefit involving a price reduction of $3.27 per ton for compliance coal purchased during 2007.  *Id.*  Black Diamond did not factor **Amendment No. 1** with CIT Group, nor did it request an advance from CIT Group based on **Amendment No. 1**.  [Doc. 117, Ex. 15, Lew Dep. at 139:16-140:6; Ex. 3, Franklin Dep. at 35:6-23; Ex. 12, Hegger Dep. at 45:18-48:11].

CIT Group was aware of the 1.5 million dollar payment pursuant to **Amendment No. 1** and did not object to Black Diamond's receipt and use of those funds.  [Doc. 117, Ex. 29 at CIT 1189; Ex. 15, Lew Dep. at 111:13-113:4; Ex. 3, Franklin Dep. at 149:10-150:22].

In a Credit Approval Form, dated October 23, 2006, analyzing Black Diamond's defaults under its various loan agreements, CIT Group described the 1.5 million dollar "prepayment" on future coal sales from Commodities to Black Diamond and recognized that Black Diamond would utilize the prepayment to improve its "liquidity options."  [Doc. 117, Ex. 25 at CIT 5850]. In the same Credit Approval Form, CIT Group set forth it would "[p]ermit the Constellation Energy prepayment noted above (not in the ordinary course of business)."  *Id.*

19

On November 30, 2006, Commodities and Black Diamond entered into **Amendment No.
2** to the **May 2006 Coal Supply Agreement**.   [Doc. 117, Ex. 38 at CONSTELLATION-
0003735].   **Amendment No. 2** reduced the quantity of 1% quality coal delivered to Commodities
by rail during the period between January 1, 2007, and March 31, 2007, and the quantity of
compliance coal between April 1, 2007, and December 31, 2007.   *Id.*   **Amendment No. 2**
included a new provision requiring Black Diamond to deliver 30,000 tons per month of 1% coal
to Commodities by truck during the 2007 calendar year.   *Id.*   In consideration for the quantity
reductions, as well as the modification of delivery method, Commodities agreed to pay 1.1
million dollars to Black Diamond.   [Doc. 117, Ex. 38 at CONSTELLATION-0003736].
Commodities wired the payment to the Bank of New York Account set forth in the **Consent
Agreement**.   [Doc. 117, Ex. 17 at CIT 0309; Ex. 41 at CONSTELLATION-0005136].   CIT
Group's affiliate was aware of the terms of this Amendment and approved of its execution.
[Doc. 117, Ex. 2, Sergent Dep. at 24:3-24:17].   Black Diamond did not factor **Amendment No.
2**, nor did CIT Group advance any funds against **Amendment No. 2**.   [Doc. 117, Ex. 15, Lew
Dep. at 140:1-6; Ex. 3, Franklin Dep. at 38:12-39:7, 40:23-41:9].

On July 24, 2007, Commodities and Black Diamond executed **Amendment No. 3** to the
**May 2006 Coal Supply Agreement**.   [Doc. 117, Ex. 39 at CIT 00020].   **Amendment No. 3**
reduced the amount of compliance coal to be delivered by Black Diamond to Commodities
during the 2008 calendar year.   *Id.*   In consideration for the tonnage reduction, Commodities
agreed to pay Black Diamond 1.65 million dollars, which was transferred by Commodities to the
Bank of New York Account identified in the **Consent Agreement**.   [Doc. 117, Ex. 39 at CIT
00021; Ex. 3, Franklin Dep. at 41:11-43:10; Ex. 17 at CIT 0309; Ex. 41 at CONSTELLATION-
0005350].   Commodities and Black Diamond also exchanged mutual releases and discharges
regarding the quantity reduction set forth in **Amendment No. 3**.   [Doc. 117, Ex. 39 at CIT
00021].   Black Diamond neither factored **Amendment No. 3**, nor did it seek any advance from

CIT Group pursuant to **Amendment No. 3**.  [Doc. 117, Ex. 15, Lew Dep. at 140:1-6; Ex. 3, Franklin Dep. at 43:11-43:24].

On August 9, 2007, Commodities and Black Diamond entered into **Amendment No. 4** to the **May 2006 Coal Supply Agreement**.  [Doc. 117, Ex. 40 at CONSTELLATION-0003748]. Black Diamond again sought to reduce the delivery benchmarks for 1% coal; this time requesting a reduction of 50,000 tons per month during the five-month period between August 1, 2007, and December 31, 2007.  *Id.*  In consideration for the quantity reduction, Commodities agreed to pay 1.35 million dollars, which amount was transferred to the Bank of New York Account set forth in the **Consent Agreement**.  [Doc. 17, Ex. 40 at CONSTELLATION-0003749; Ex. 17 at CIT 0309; Ex. 3, Franklin Dep. at 45:6-46:18; Ex. 41 at CONSTELLATION-0005352]. Commodities and Black Diamond also issued mutual releases and discharges as to any claims related to the quantity reduction set forth in **Amendment No. 4**.  [Doc. 117, Ex. 40 at CONSTELLATION-0003749].   Like the other amendments, Black Diamond did not factor **Amendment No. 4** with CIT Group, nor did it seek an advance of funds from CIT Group based on **Amendment No. 4**.  [Doc. 117, Ex. 15, Lew Dep. at 140:1-6; Ex. 3, Franklin Dep. at 47:10-15].

Commodities made payments, the **Amendment Amounts**, totaling 5.6 million dollars pursuant to the four **Amendments**.  [Doc. 117, Ex. 41].   CIT Group's internal accounting records do not reflect advances against the amendment amounts.  [Doc. 117, Ex. 32].   None of the **Amendments** to the **May 2006 Coal Supply Agreement** impacted amounts invoiced and factored by CIT Group.  [Doc. 117, Ex. 2, Sergent Dep. at 161:7-165:9].

Notwithstanding the tonnage reductions set forth in the **Amendments** to the **May 2006 Coal Supply Agreement** and the effecting of bookouts by Commodities and Black Diamond, further reducing Black Diamond's delivery burden to Commodities, Black Diamond failed to deliver 20,000 tons of coal to Commodities in January 2008.  [Doc. 117, Ex. 43 at CONSTELLATION-0005420].   This failure invoked the liquidated damages provisions of the

relevant **Coal Supply Agreements**, causing Commodities to incur $533,000.00 in damages due to the missed deliveries. [Doc. 117, Ex. 9 at CIT0549; Ex. 43 at CONSTELLATION-0005420; Ex. 42].

In February 2008, Black Diamond's deliveries of coal to Commodities became more sporadic. [Doc. 117, Ex. 43 at CONSTELLATION-0005421]. In total, Black Diamond failed to deliver over 145,400 tons of coal to Commodities in February 2008, resulting in $5,483,766.25 in liquidated damages due to Commodities. [Doc. 117, Ex. 43 at CONSTELLATION-0005421; Ex, 42]. In total, Commodities suffered $6,016,766.25 in liquidated damages during January and February 2008. [Doc. 117, Ex. 43 at CONSTELLATION-0005419; Ex. 42]. These amounts have never been paid to Commodities. [Doc. 117, Ex. 42; Ex. 43].

Eighteen of the **Invoices**, as well as five of the **Uninvoiced Deliveries**, for which CIT Group seeks payment, arose under five contracts for which Black Diamond did not meet its delivery obligations. [Doc. 117, Ex. 43 at CONSTELLATION-0005420-5421; Ex. 42].

In addition to the coal Black Diamond failed to deliver to Commodities, Black Diamond also failed to pay for coal delivered to it by Commodities in January and February 2008. [Doc. 117, Ex. 42; Doc. 118, Hoskins Aff. at ¶¶ 7, 8, 9]. Pursuant to two coal agreements, Black Diamond owes Commodities $2,758,268.51 for coal that was delivered to it but for which it never paid.[20] [Doc. 117, Ex. 33 at CONSTELLATION-0005403 – 5405; Ex. 7 at CONSTELLATION-0005427]. CIT Group's **Inventory Security Interest** granted under the terms of the **Credit and Inventory Security Agreement** attached to this coal sold by Commodities to Black Diamond. [Doc. 117, Ex. 30 at CIT0570].

Black Diamond also failed to pay the net amounts due on direct bookout invoices. [Doc. 118, Hoskins Aff. at ¶¶ 11, 12]. In January 2008, Black Diamond and Commodities agreed to book out transactions pursuant to two contracts, resulting in a net amount owed to Commodities

---

[20]     Invoices in the amount of $2,785,557.54, ($36,761.16), and $9,472.13, respectively. [Doc. 117, Ex. 33]

totaling $1,045,000.  [Doc. 118, Hoskins Aff. at ¶¶ 11, 12; Doc. 117, Ex. 7 at CONSTELLATION-0005427].  Similarly, in February 2008, Commodities and Black Diamond booked out numerous transactions, resulting in a net amount due to Commodities totaling $559,000.  *Id.*

In total, Black Diamond owes Commodities $4,362,268.51 for coal delivered but not paid for and for net amounts due on the booked out transactions between the parties during January and February 2008.  [Doc. 118, Hoskins Aff. at ¶ 13; Doc. 117, Ex. 7 at CONSTELLATION-0005427].

On February 11, 2008, CIT Group terminated its **Factoring Agreement** with Black Diamond due to various defaults.  [Doc. 117, Ex. 44; Ex. 3, Franklin Dep. at 105:25-106:24].

On or about February 11, 2008, Mr. Sergent met with Commodities at Commodities' offices in Baltimore, Maryland.  [Doc. 157, Second P. Thompson Aff. at ¶ 31].  During the meeting, Mr. Sergent advised Commodities that Black Diamond's funding had been terminated by CIT Group and CIT Capital, and advised Black Diamond would no longer be delivering coal to Commodities, at least until Black Diamond found additional funding.  *Id.*

Several days later on February 19, 2008, CIT Group, CIT Capital, and Prudential filed an involuntary petition under Chapter 11 against Black Diamond.  [Doc. 117, Ex. 45].  On March 11, 2008, the court issued an order for relief under Chapter 11 of Title 11 of the United States Code in the involuntary case.  [Doc. 117, Ex. 46].

On March 13, 2008, after the entry of the Order for Relief, Commodities delivered the **First Termination Notice** to Black Diamond which terminated all of the **Coal Supply Agreements** still in effect between Black Diamond and Commodities,[21] except for the **May 2006 Coal Supply Agreement**.  The **First Termination Notice** established March 13, 2008, as the Early Termination Date for those contracts.  [Doc. 117, Ex. 47 at CIT 0890 – 0892].  In accordance with the terms of the **Coal Supply Agreements**, Commodities calculated a net

---

[21]    Ref. No. BLJ08(TP)0002, Ref. No. BLJ07(TP)0010, Ref. No. BLJ07(TS)0004, Ref. No. BLJ09(TP)0001, Ref. No. BLJ08(TP)0001, and Ref. No. BLJ08(TP)0004.

**Termination Payment**, which included losses for the future tons of coal Black Diamond would not deliver to Commodities under the **Coal Supply Agreements**.  In the **First Termination Notice**, Commodities notified Black Diamond it owed Commodities a total of $82,771,818.57. [Doc. 117, Ex. 47 at CIT 0898].  The **First Termination Notice** also stated the net **Termination Payment** included amounts "netted, recouped, and/or setoff" against amounts Commodities might owe Black Diamond pursuant to the terms of the various terminated **Coal Supply Agreements**.  [Doc. 117, Ex. 47 at CIT 0895].

On March 24, 2008, after waiting the necessary time period under the **Consent Agreement**, Commodities sent a second notice to Black Diamond terminating the **May 2006 Coal Supply Agreement** and subsequently notified Black Diamond on March 25, 2008, that Commodities was owed an additional $11,002,331.00 in termination damages under the **May 2006 Coal Supply Agreement**.  [Doc. 117, Ex. 47 at CIT 0900 – 0908].

At no time during the course of the Chapter 11 proceeding did Black Diamond object to Commodities' termination of the relevant **Coal Supply Agreements**.  Similarly, at no time did Black Diamond claim Commodities breached the terms of the relevant **Coal Supply Agreements** or failed to timely make any payment pursuant to the **Coal Supply Agreements**.

On August 15, 2008, Commodities filed a proof of claim in Black Diamond's Chapter 11 proceeding asserting a claim in the amount of $93,774,149.57, plus interest.  [Doc. 117, Ex. 47 at CIT 0884].  The net amount Black Diamond owes Commodities in **Termination and Liquidated Damages** totals $93,215,149.58.  [Doc. 117, Ex. 42].[22]

On August 15, 2008, CIT Group filed a proof of claim in Black Diamond's Chapter 11 case asserting a claim in the amount of $14,109,469.55, plus interest.  [Doc. 117, Ex. 48].  CIT Group asserted claims for amounts owed under the **Invoices** (and invoices with other counterparties), but did not include any statement that it was owed amounts provided by

---

[22]     The amount recorded on Commodities' proof of claim appears to double count the $559,000 for the February 2008 bookout.  *Compare* Doc. 117, Ex. 42 to Ex. 43 at CONSTELLATION-0005419.

Commodities based on the four Amendments.  [Doc. 117, Ex 3, Franklin Dep. at 230:19-231:6, 232:22-233:7; Ex. 48].   CIT Group acknowledged it is not entitled to recover from both Black Diamond and Commodities.  [Doc. 117, Ex. 3, Franklin Dep. at 233:8-18].

On August 27, 2008, CIT Group filed a six count complaint.  An amended complaint was filed on November 13, 2008, adding a claim for conversion.  On August 24, 2009, CIT Group filed its **Second Amended Complaint**.  [Doc. 93].  The pending cross motions for summary judgment are based on the claims for relief in the **Second Amended Complaint.**

CIT Group's First Claim for Relief alleges Commodities breached contracts with Black Diamond by failing to pay CIT Group $15,598,859.40, plus interest, due pursuant to the **Invoices**, the **Uninvoiced Deliveries** and the **Amendment Amounts**.

CIT Group's Second Claim for Relief replicates its breach of contract claim and seeks the same $15,598,859.40 damages under the **Coal Supply Agreements** and the **Amendments** as "money due on account."

CIT Group's Third Claim for Relief, entitled "account stated", seeks damages of $9,998,859.40 for the amounts due for coal delivered by Black Diamond to Commodities pursuant to the invoiced and **Uninvoiced Deliveries**.

CIT Group's Fourth Claim for Relief seeks recovery for "unjust enrichment."

CIT Group's Fifth Claim for Relief, entitled "violation of security interest and lien", alleges pursuant to § 9-406 of the New York Uniform Commercial Code payment of the **Amendment Amounts** to Black Diamond did not discharge Commodities' responsibilities pursuant to the **May 2006 Coal Supply Agreement**, the **Amendments**, the **Factoring Agreement** and the **Consent Agreement**.  CIT Group claims the **Amendment Amounts**, totaling $5,600,000.00, were properly due and payable to CIT Group, rather than Black Diamond.

Finally, CIT Group's Sixth Claim for Relief alleges Commodities converted the coal delivered by Black Diamond pursuant to the **Coal Supply Agreements** because Commodities "has not paid new value for the Inventory and it intends to offset the value of the Inventory in

total or partial satisfaction of a money debt owed to it from the Debtor." [Doc. 93, **Second Amended Complaint** at ¶ 60]. CIT Group seeks damages totaling the market value of the converted coal, believed to be in excess of $20,000,000.00.

CIT Group moved for summary judgment on all claims. Commodities moved for summary judgment seeking dismissal of all claims. For the reasons set forth below Commodities' motion for summary judgment should be granted in its entirety and CIT Group's motion should be denied in its entirety.

## CONCLUSIONS OF LAW

Sixth Claim for Relief – Conversion Against Commodities

To establish liability for conversion under the Sixth Claim for Relief, CIT Group must show Commodities committed an "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-404 (2d Cir. 2006).[23] CIT Group contends Commodities converted the coal delivered under the **Coal Supply Agreements** because CIT Group allegedly "held a superior security interest" in Black Diamond's inventory. [Doc. 93, **Second Amended Complaint** at ¶ 61].

CIT Group's conversion claim fails as a matter of law for two reasons. First, Commodities was a "buyer in the ordinary course of business" as set forth in N.Y.U.C.C. § 2-109(b)(9), and, as a result, purchased and acquired the coal free of CIT Group's **Inventory Security Interest**. *Key Corporate Capital, Inc. v. Tilley*, 216 F.App'x. 193 (3d Cir. 2007) (granting summary judgment on conversion claim because purchaser qualified as a buyer in the ordinary course). Second, the undisputed facts demonstrate CIT Group authorized the sale of coal inventory "in the regular course" of Black Diamond's business, and thereby extinguished its own **Inventory Security Interest**.

---

[23] The law in Kentucky is similar. *Madison Capital Co., LLC v. S & S Salvage*, Civ. No. 4:08-CV-00134, 2011 WL 2378646, at *4 (W.D. Ky. Jun. 15, 2011).

First, CIT Group's conversion claim fails because Commodities satisfies the N.Y.U.C.C. definition of a "buyer in ordinary course of business" ("BIOCB").   Section 1-201(9) of the N.Y.U.C.C. defines a BIOCB as:

> a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person … in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. A person that sells oil, gas, or other minerals at the wellhead or minehead is a person in the business of selling goods of that kind. A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit, and may acquire goods or documents of title under a preexisting contract for sale. Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under article 2 may be a buyer in ordinary course of business. A person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt is not a buyer in ordinary course of business.

N.Y.U.C.C. § 1-201(9) (McKinney's 2001).

Under N.Y.U.C.C. § 9-320(a), a BIOCB is afforded special protection and takes free of a fully perfected inventory security interest even if the BIOCB knows of the security interest. N.Y.U.C.C. § 9-320(a)[24] ("a buyer in ordinary course of business … takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence").  Thus, a BIOCB effectively cuts off any security interest created by the seller in its collateral – including inventory – which security interest would otherwise follow with the collateral into the buyer's hands.

The practical effect of these provisions is that a party who purchases inventory in good faith from a merchant selling goods of that kind takes free from any lien or security interest encumbering that inventory, even if he knows about the lien, provided that he has no actual knowledge that the sale violates the lien or security interest in some specific way.  *See, e.g., U.S. v. Handy and Harman*, 750 F.2d 777, 781-82 (9th Cir. 1984); *General Electric Credit Corp.*

---

[24]   As N.Y.U.C.C. § 1-201(25)(c) provides, "knows" or "knowledge" means a BIOCB has "actual knowledge" and not constructive knowledge of the security interest.

*v. Gayl (Matter of Darling's Homes, Inc.)*, 46 B.R. 370, 375-76 (Bankr. D. Del. 1985) (BIOCB must be a good faith purchaser and good faith in this context means subjective honesty in fact). Because the undisputed facts demonstrate Commodities purchased the coal from Black Diamond, a coal merchant, in good faith, on credit terms, and had no actual knowledge of the **Credit and Inventory Security Agreement**, Commodities qualifies as a BIOCB and CIT Group's claim for conversion fails as a matter of law.

Commodities purchased all of the coal pursuant to the **Invoices** and **Uninvoiced Deliveries** in good faith and without any knowledge of CIT Group's **Inventory Security Interest**.  [Doc. 117, Ex. 8, Nelson Dep. at 43:16-20; Ex. 3, Franklin Dep. at 133:11-15; Ex. 2, Sergent Dep. at 138:20-25; Ex. 31].    The sales of coal between Black Diamond and Commodities were bona fide sales between two unrelated parties.

Neither CIT Group nor Black Diamond ever forwarded a copy of the **Credit and Inventory Security Agreement** to Commodities (or Constellation), nor did either advise Commodities (or Constellation) at any time that CIT Group had been granted a security interest in Black Diamond's inventory.  [Doc. 117, Ex. 8, Nelson Dep. at 43:16-20; Ex. 3, Franklin Dep. at 133:11-15; Ex. 2, Sergent Dep. at 138:20-25].  Notwithstanding Commodities' prior consent to the **Factoring Agreement**, Commodities never executed a consent agreement relating to the **Credit and Inventory Security Agreement**, nor was it ever asked to do so.  [Doc. 117, Ex. 12, Hegger Dep. at 94:10-13; Ex. 2, Sergent Dep. at 139:9-16; Ex. 16, Funk Dep. at 81:17-82:2]. The evidence of record shows Commodities had no knowledge that its purchases of coal subject to the **Invoices** and **Uninvoiced Deliveries** violated the terms of the **Credit and Inventory Security Agreement**.  Commodities was a buyer who bought "in good faith, without knowledge that the sale violates the rights of another person in the goods," and accordingly, satisfies the first criteria of the N.Y.U.C.C. definition of buyer in the ordinary course.  N.Y.U.C.C. § 1-201(9).

CIT Group claims Commodities' BIOCB status should be defeated because Commodities "specifically devised its security scheme to circumvent [CIT Group's] liens," and "the purpose . . . was to allow [Commodities] to steal the inventory through the assertion of Termination and Liquidated Damages as soon as Black Diamond defaulted."  [Doc. 153 at 27]. These allegations are contradicted by the actual facts.

First, the "security scheme" contained in the **Coal Supply Agreements** is the identical "security scheme" CIT Group reviewed and acknowledged in the **May 2006 Coal Supply Agreement**.  CIT Group admits each **Coal Supply Agreement** contained "nearly identical" terms and the undisputed facts demonstrate CIT Group recognized the potential risks associated with the rights and defenses afforded Commodities under the **May 2006 Coal Supply Agreement**.  [Doc. 119, p. 16; Ex. 1, Amato Decl. at ¶ 28].  CIT Group knew the terms of the **May 2006 Coal Supply Agreement**, including Commodities' rights to recoup and/or set-off, before it entered into the **Factoring Agreement** with Black Diamond.  [Doc. 117, Ex. 3, Franklin Dep. at 23:2-22; 26:4-24; Ex. 10, Hudgens Dep. at 40:8-15; Ex. 11 at CIT 0723 – 0724; Ex. 22 at CIT 1752, 1754, 1891 – 1892; Ex. 3, Franklin Dep. at 63:10-65:14, 68:12-69:13, 70:9-71:1, 74:13-75:14, 81:14-83:18].

Mr. Franklin, CIT Group's in-house counsel, raised potential concerns in e-mail messages prior to the execution of the **Factoring Agreement**.  The messages confirmed in the event of Black Diamond's default, Commodities' recoupment and set-off rights could eliminate any amounts owed to CIT Group.  [Doc. 117, Ex. 22 at CIT 1752, 1754, 1891].

For example, after reviewing the draft **May 2006 Coal Supply Agreement**, Mr. Franklin stated there were broad set-off rights under the agreement and CIT Group needed to understand the risk a large block of accounts could suddenly disappear if Black Diamond were to breach the **May 2006 Coal Supply Agreement** and Commodities exercised its right to recoup or set-off.  [Doc. 117, Ex. 22 at CIT 1752, 1754].  Mr. Franklin expressed his "greatest fear" which was "the Constellation contract goes into default and all the Constellation A/R

disappears through a setoff by Constellation." [Doc. 117, Ex. 22 at CIT 1891]. Accordingly, CIT Group was well aware of the alleged "security scheme" and did not request any modifications to the "security scheme" or claim it was instituted in bad faith.

The undisputed facts demonstrate Commodities' purpose in entering into the **Coal Supply Agreements** with Black Diamond was to buy coal for its portfolio. Commodities paid Black Diamond tens of millions of dollars[25] for coal delivered under the **Coal Supply Agreements**. CIT Group has not elucidated any facts showing any of the **Coal Supply Agreements** were executed at prices below fair market value, therefore bad faith cannot be inferred. *Massey-Ferguson, Inc. v. Helland*, 434 N.E.2d 295, 298-99 (Ill. App. 1982).

The sales of coal also do not violate the **Credit and Inventory Security Agreement** or the **Factoring Agreement**. The undisputed facts demonstrate CIT Group approved all of the sales of coal to Commodities reflected in the **Invoices** for factoring purposes and at no time claimed any of the sales violated its security interests. By CIT Group's own admission it approved each of these sales as being in the "ordinary course of business." [Doc. 117, Ex. 13 at CIT0283; Ex. 15, Lew Dep. at 29:2-30:1]. The facts further demonstrate CIT Group even increased the percentage of Commodities invoices Black Diamond could factor from 50 percent to 70 percent of all invoices available for factoring. [Doc. 117, Ex. 13 at CIT 0284; Ex. 28 at CIT0333]. If such sales were a violation of its security interests, CIT Group should have precluded any sales of coal to Commodities. CIT Group never did. In any event, the facts demonstrate Commodities had no knowledge of the **Credit and Inventory Security Agreement**, and thus could not have had actual knowledge that its purchases violated the terms of the **Credit and Inventory Security Agreement**. [Doc. 117, Ex. 31; Doc. 157, Second P. Thompson Aff. at ¶ 20. Accordingly, CIT Group's claims of bad faith fail.

In addition to Commodities' purchase of coal from Black Diamond in good faith and without knowledge of any violation of CIT Group's rights, Black Diamond was in the business of

---

[25]      It appears the figure is close to 50 million dollars.

mining and selling coal to contracting counterparties.    CIT Group concedes this point in its **Second Amended Complaint**, stating "at all times relevant, [Black Diamond] is engaged in the extraction, processing and sale of coal."    [Doc. 93 at ¶ 14].    The sales of coal between Black Diamond and Commodities were bona fide sales pursuant to arm's length negotiated **Coal Supply Agreements**.    Accordingly, Commodities purchased coal from a "seller . . . engaged" in the business of selling coal and the sales comported with the customary practices in the coal industry.    N.Y.U.C.C. § 1-201(9).

While at oral argument and in its papers, CIT Group contends the coal sales between Commodities and Black Diamond were "speculative coal hedges."    These allegations are contradicted by the facts elucidated by the parties.    First, it is undisputed coal was delivered by Black Diamond pursuant to each of the **Coal Supply Agreements** covering the **Invoices** and **Uninvoiced Deliveries**.    Second, a review of the terms of each of the **Coal Supply Agreements** shows the agreements are physical coal supply agreements – requiring delivery of quantities of the physical coal.    Contrary to CIT Group's contention, the agreements may not be characterized as speculative, financial or derivative contracts which do not require some type of physical delivery.

As noted above, CIT Group authorized Black Diamond's sales of coal to Commodities in the ordinary course of Black Diamond's business based on the **Factoring Agreement** and **Credit and Inventory Security Agreement** and through the course of dealing between the parties.    Like the **Factoring Agreement**, the **Credit and Inventory Security Agreement** specifically authorized sales "in the regular course of [Black Diamond's] business," and stated that Black Diamond represented that all inventory "will be sold and shipped by [Black Diamond] only in the ordinary course of your business."    *See, e.g., Matter of Special Abrasives, Inc.*, 26 B.R. 399, 403 (Bankr. E.D. Mich. 1983) (security agreement authorized sale of inventory in the ordinary course of business, thus, buyer of inventory was a BIOCB).

Black Diamond was in the business of selling coal and Commodities purchased coal from Black Diamond on credit and under pre-existing contracts.

N.Y.U.C.C. § 1-201(9) states a "buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit, and may acquire goods . . . under a pre-existing contract for sale." Here, all the **Coal Supply Agreements** contained terms allowing Commodities to pay for the coal sixty days after receipt of an invoice. [Doc. 117, Ex. 8, Nelson Dep. at 79:6-80:9; Ex. 12, Hegger Dep. at 25:5-26:22; Ex. 9 at CIT0540 – 0541; Ex. 6 at CONSTELLATION-0003841]. This arrangement constitutes buying on unsecured credit such that CIT Group's **Inventory Security Interest** was extinguished at the moment Black Diamond loaded the coal into Commodities' trucks or railcars and Commodities acquired title to the coal. [Doc. 117, Ex. 23 at Article 3.3(a)]. *See, e.g., First National Bank, Martinsville v. Crone*, 301 N.E.2d 378 (Ind. App. 1973) (buyer who had agreement to pay remainder of total sale price of logs in the future was a BIOCB); *In re Fred Madore Chevrolet-Pontiac-Oldsmobile, Inc.*, 219 B.R. 938 (Bankr. D.N.H. 1998) (purchaser involved in no money down financing contract qualified for BIOCB status). Commodities acquired the coal subject to the **Invoices** on unsecured credit terms and acquired title to the coal at issue at the time of delivery pursuant to the various **Coal Supply Agreements** with the intent to pay as required.

Black Diamond's subsequent bankruptcy, weeks after the transfer of title of the coal to Commodities but before the sixty-day payment term allowed by the **Coal Supply Agreements** expired, triggered an Event of Default under the various **Coal Supply Agreements**. [Doc. 117, Ex. 5; Ex. 26; Ex. 9 at CIT0547; Ex. 46; Ex. 47 at CIT 0890 – 0892, 0898, 0900 – 0908]. Commodities then followed the procedure set forth in the various **Coal Supply Agreements**, notified Black Diamond of its default and Commodities' termination of the various outstanding **Coal Supply Agreements** on March 13, 2008, and on March 24, 2008, and simultaneously notified Black Diamond of its **Termination and Liquidated Damages** under the terms of the **Coal Supply Agreements**. [Doc. 117, Ex. 47 at CIT 0890 – 0892, 0898, 0900 – 0908].

32

Commodities' rights to recoup and offset its damages arose at the time Black Diamond was notified of its default; weeks after Commodities' acquisition of the subject coal and weeks after the extinguishing of CIT Group's **Inventory Security Interest**.  [Doc. 117, Ex. 47 at CIT 0890 – 0892, 0898, 0895, 0900 – 0908].

Black Diamond's involuntary bankruptcy initiated on February 19, 2008, the subsequent termination of the **Coal Supply Agreements**, and Commodities' accrual of termination damages does not negate Commodities' status as a BIOCB.   Once a party qualifies as a BIOCB, such status cannot change retroactively due to the occurrence of subsequent events. *Matter of Gary Aircraft Corp.*, 681 F.2d 365, 374 (5th Cir. 1982) (subsequent knowledge of violation of security agreement did not affect purchaser's BIOCB status); *In re Pearson Industries, Inc.*, 142 B.R. 831, 843 (Bankr. C.D. Ill. 1992) (once buyer qualifies as a BIOCB, subsequent facts cannot be applied retroactively to deny a party BIOCB status).

Also, the coal delivered by Black Diamond to Commodities pursuant to the **Invoices** was sold "pursuant to a preexisting contract," further confirming Commodities' status as a BIOCB. None of the coal delivered under the **Invoices** or the **Uninvoiced Deliveries** involved a contract entered into on or around the filing of Black Diamond's Chapter 11 bankruptcy case, nor did the parties enter into those contracts in order to reduce the amounts of Commodities' **Termination and Liquidated Damages** incurred as a result of Black Diamond's Chapter 11 bankruptcy case. Commodities received delivery of coal from Black Diamond on unsecured credit pursuant to the various **Coal Supply Agreements** in December 2007, January 2008, and February 2008, just as it had for the prior eighteen months.

In an effort to bolster its position, CIT Group argues Commodities acquired "the coal *as credit, not on credit* . . . in order to secure Black Diamond's substantial obligations to [Commodities] that existed at the time it acquired the coal."  [Doc. 153 at 24-25 (Emphasis in original)].   However, because Commodities had not incurred termination or liquidation damages when it acquired the subject coal, there was no money debt owed by Black Diamond to

Commodities for which Commodities needed security.  CIT Group does not contest the fact buying on sixty-day payment terms, as Commodities did here, constitutes buying on credit for purposes of BIOCB status.  CIT Group does not cite any authority in support of its claim Commodities did not buy on credit.  Because Commodities' **Termination and Liquidated Damages** did not exist at the time Commodities acquired the subject coal, Commodities never acquired the coal "as security for" a "money debt."

The last sentence of the definition of BIOCB under the N.Y.U.C.C. § 1-201(9) states a buyer that "acquires goods . . . as security for or in total or partial satisfaction of a money debt is not a buyer in the ordinary course of business."  Thus, critical to the resolution of this case is whether Commodities acquired the coal pursuant to the **Invoices** and the **Uninvoiced Deliveries** as security for or in total or partial satisfaction of a money debt.

The undisputed facts demonstrate Commodities did not acquire any of the coal in such a fashion, and qualifies as a BIOCB.

Commodities acquired all of the coal delivered by Black Diamond prior to Black Diamond's Chapter 11, on February 19, 2008, and prior to the dates on which Commodities terminated the various agreements, namely March 13, 2008 and March 24, 2008.  Accordingly, at the time Commodities acquired the coal sold pursuant to the **Invoices** and **Uninvoiced Deliveries**, no money debt was owed by Black Diamond to Commodities.  The **Termination and Liquidated Damages** suffered by Commodities accrued after Black Diamond transferred title to the coal to Commodities and after the commencement of Black Diamond's involuntary bankruptcy case.   [Doc. 117, Ex 42; Ex. 43 at CONSTELLATION-0005419].     Because Commodities' **Termination and Liquidated Damages** – Black Diamond's money debt to Commodities – did not accrue until months after Commodities' acquisition of the subject coal, Commodities' acquisition clearly was not "as security for or in total or partial satisfaction of a money debt."

34

CIT Group concedes no pre-existing money debt existed at the time Commodities acquired the coal pursuant to the **Invoices** and **Uninvoiced Deliveries** and therefore Commodities' **Termination and Liquidated Damages** (Black Diamond's debt to Commodities) did not accrue until after the acquisition of the coal.  First, the Declaration of Mr. Franklin filed in support of CIT Group's motion for summary judgment contains a section entitled, "[Commodities'] Liquidation and Termination Damages Did Not Accrue Until March 2008."  [Doc. 119, Franklin Decl. at 14].  In the same section, Mr. Franklin concedes Commodities "terminated its agreements with Black Diamond giving rise to the liquidation damages and termination damages on March 13, 2008 and March 24, 2008 … Prior to these letters, [Commodities] did not inform [CIT Group] or Black Diamond that Black Diamond owed any liquidation or termination damages."  [Doc. 119, Franklin Decl. at ¶ 47].  Finally, Mr. Franklin concludes "… Commodities' alleged liquidation and termination damages, which comprise approximately 97% of its alleged offset damages, did not accrue until at the earliest March 20, 2008."  [Doc. 119, Franklin Decl. at ¶ 48).

Thus, CIT Group's in-house counsel concedes no pre-existing money debt owed by Black Diamond to Commodities existed at the time Commodities incurred its Termination (and Liquidated) Damages.[26]

---

[26]     CIT Group directly contradicted Mr. Franklin's declarations in its Opposition Brief, arguing because Black Diamond had coal delivery obligations under the **Coal Supply Agreements**, "Black Diamond's debt to [Commodities] was therefore incurred and came into existence at the time the coal agreements were executed, not after the unpaid coal was delivered."  [Doc. 153, p. 23].  Black Diamond's obligation to deliver coal does not constitute a money debt.  *See Handy and Harman*, 750 F.2d at 782. CIT Group cannot establish any of the operative events giving rise to Commodities' **Termination and Liquidated Damages** existence prior to Black Diamond's default, or that the damages existed at the time Commodities acquired the coal at issue. [Doc. 117, Ex. 9 at CIT0536; Ex. 23 at Article 3.3(a); Doc. 156, Second Hoskins Aff. at ¶¶ 35, 36].
     The law is well-settled a party cannot defeat summary judgment by engineering a dispute with itself.  *See, e.g., Brown v. Henderson*, 257 F.3d 246, 252 (2d. Cir. 2001) (factual allegations contained in an affidavit in opposition which contradict prior deposition testimony will not defeat summary judgment); *Jones v. New York City Health & Hospitals Corp.*, 102 F.App'x. 223, 226 n.2 (2d. Cir. 2004) ("'It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment'") quoting *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987).

CIT Group relies heavily on *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, No. 01 Civ. 1047, 2002 WL 31174470 (S.D.N.Y. Sept. 26, 2002); *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635 (5th Cir. 1991); *American Furniture Co., Inc. v. Extebank*, 676 F.Supp. 455 (E.D.N.Y. 1987) and *U.S. v. Handy and Harman*, 750 F.2d 777 (9th Cir. 1984), arguing Commodities is attempting to pay for the coal inventory through the use of setoffs. CIT Group's reliance on these cases is misplaced.

*Fleet Capital, Permian Petroleum, American Furniture* and *Handy and Harman* are all distinguishable. The cases all involved a creditor utilizing an antecedent or pre-existing debt to try and eliminate their payment obligation, which is not this case.

For example, in *Fleet Capital* Defendant Yamaha Motor set off its purchases of golf cars from Bruedan against antecedent debt due to both Yamaha Motor and its affiliate by Bruedan. *Fleet Capital*, 2002 WL 31174470, at *18. Similarly, in *Permian Petroleum* the defendant "exercised a pre-existing contract credit against its money obligation and gave no new value in exchange for the Permian [liquefied petroleum gas] in which [the lending institution] held a perfected security interest." *Permian Petroleum,* 934 F.2d at 649. In *American Furniture*, rather than pay the full amount for products sold to it by non-party Northeast, American Furniture "purchased the goods from Northeast, not by giving new value, but by setting off a debt owed it by Northeast against the amount due on the goods." *American Furniture*, 676 F.Supp. at 457. Finally, the Ninth Circuit in *Handy and Harman* found that Handy and Harman's setting off of an antecedent debt against the amounts it owed to Coronado disqualified Handy and Harman from BIOCB status because Handy and Harman failed to provide Coronado with "new value." *Handy and Harman*, 750 F.2d at 781-82. The Ninth Circuit carefully limited the holding of its decision to "antecedent debts". *Id.* at 782.

These cases are distinguishable because here, as a purchaser on credit, Commodities did not acquire the goods as security for, or in partial or total satisfaction of, an antecedent debt

owed to Commodities by Black Diamond.  Instead, the debt at issue – the **Termination and Liquidated Damages** – accrued after Commodities acquired the coal at issue.

Accordingly, it is undisputed no pre-existing debt was due and owing by Black Diamond to Commodities at the time Commodities acquired the coal.  Thus, Commodities' acquisition of the coal was not in total or partial satisfaction of a money debt.

In addition to showing the **Termination and Liquidated Damages** arose after the sale of the coal, Commodities also established it provided new value for the coal in the form of accounts receivable to which CIT Group's security interest attached.  [Doc. 117, Ex. 6; Ex. 13 at CIT0287].

As noted above, CIT Group obtained a security interest in Black Diamond's accounts receivable at the time of the execution of the **Factoring Agreement**.  [Doc. 117, Ex. 13 at CIT0287; Ex. 3, Franklin Dep. at 50:13-51:15].   When the **Credit and Inventory Security Agreement** was executed six months later, CIT Group's accounts receivable lien was not extinguished.  Rather, as CIT Group's internal documents and the language of the **Credit and Inventory Security Agreement** reflects, the two agreements worked in tandem – on the sale of Black Diamond's coal inventory to Commodities, CIT Group's lien in the coal inventory would be extinguished and replaced by a lien on other collateral, namely the accounts receivable generated by the sale.  [Doc. 117, Ex. 30 at CIT0571].  CIT Group envisioned the **Inventory Security Agreement** and the accounts receivable lien would work in tandem.  *Id.*

Consider that a bank's security interest in inventory subsequently sold is not jeopardized where the bank also holds an accounts receivable lien.  *Amarillo Nat'l Bank v. Komatsu Zenoah America, Inc.*, 991 F.2d 273, 277 (5th Cir. 1993).  Rather, at the moment of sale, made in the ordinary course of business, the bank receives new value, in the form of accounts receivable, to replace the transferred inventory.  *Id.*  In such a case, a bank does not lose its collateral; rather, its collateral simply takes a different form.  *Id.*  This ruling is similarly confirmed by the holding in *Permian Petroleum*; if the purchaser is a buyer in the ordinary course of business, the inventory

financier is protected to the extent the security interest continues in the new value as proceeds. *Permian Petroleum*, 934 F.2d at 649.

Under the N.Y.U.C.C., the definition of proceeds of a sale "includes both cash proceeds and non-cash proceeds such as accounts receivable." *Fleet Capital*, 2002 WL 31174470, at *34. After the sale of Black Diamond's coal to Commodities, the proceeds of the transaction were the accounts receivable generated by the sale. CIT Group did not lose its collateral; rather, its collateral took a different form – an interest in the accounts receivable generated from the transaction.

CIT Group's claim that it received an "inherently flawed accounts receivable" because Commodities could recoup its **Termination Damages** by operation of the terms of the **Coal Supply Agreements** against the accounts receivable is refuted by N.Y.U.C.C. § 9-404(a)(1). [Doc. 153 at 28]. All accounts receivables are subject to N.Y.U.C.C. § 9-404(a)(1). Accordingly, the rights of all assignees, like CIT Group, are subject to "all terms of the agreement[s] between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract." N.Y.U.C.C. § 9-404(a)(1).

CIT Group further contends nothing in either the **Factoring Agreement** or **Credit and Inventory Security Agreement** allowed the extinguishment of its inventory lien "by a sale outside the ordinary course of business if that sale resulted in a receivable that could be offset by a pre-existing obligation owed by Black Diamond." [Doc. 153 at 28]. CIT Group's argument misstates the facts and the law.

First, as set forth above, no pre-existing money debt owed by Black Diamond to Commodities existed at the time Commodities acquired the coal. Further, CIT Group never claimed the sales were outside the ordinary course of Black Diamond's business. Indeed, CIT Group factored each invoice created by each delivery. [Doc. 117, Ex. 15, Lew Dep. at 29:2-9; Ex. 32 at CMS0158].

CIT Group further ignores the fact BIOCB status cannot be retroactively altered.  *In re Pearson Industries, Inc.*, 142 B.R. at 843; *Huber Pontiac, Inc. v. Wells*, 375 N.E.2d 149, 153 (Ill.App.Ct. 1978) quoting *C. Jon Dev. Corp. v. Pand-Rorsche Corp.*, 217 N.E.2d 416(Ill.App.Ct. 1966); *Matter of Gary Aircraft Corp.*, 681 F.2d at 374.  A secured party's lien on collateral is not jeopardized where the party also holds an accounts receivable lien.   The secured party's interest converts from the inventory to the accounts receivable, which constitute new value under the N.Y.U.C.C.  *See, e.g., Amarillo Nat'l Bank v. Komatsu Zenoah America*, Inc., 991 F.2d 273 (5th Cir. 1993); *Mbank Alamo Nat'l Assn. v. Raytheon Co.*, 886 F.2d 1449 (5th Cir. 1989).  Therefore, Commodities satisfied the new value requirement and is a BIOCB.

CIT Group also claims that "given the sheer quantity of coal," Commodities was a buyer in bulk and not a BIOCB.  [Doc. 153 at 32].  Pursuant to the definition of a BIOCB, a "person that acquires goods in a transfer in bulk … is not a buyer in ordinary course of business." N.Y.U.C.C. § 1-201(9).  The original Article 6 of the N.Y.U.C.C. defining bulk transfers was repealed effective July 1, 2001.  Neither New York nor Kentucky has adopted revised Article 6 which defines bulk sales.  The former bulk transfer rules under Article 6 no longer apply under the N.Y.U.C.C.  *Parent v. Amity Autoworld, Ltd.*, 832 N.Y.S.2d 775, 15 Misc.3d 633 (Dist. Ct. Suffolk Cty. 2007) (transferee of assets "did not violate Article 6 of the Bulk Transfer section of the [N.Y.U.C.C.] as it was repealed by the NYS Legislature effective July 1, 2001").

Even assuming revised Article 6 applies there is no violation.  A bulk sale is defined as:

> a sale not in the ordinary course of the seller's business of more than half the seller's inventory, as measured by value on the date of the bulk-sale agreement, if on that date the buyer has notice, or after reasonable inquiry would have had notice, that the seller will not continue to operate the same or a similar kind of business after the sale.

U.C.C. § 6-102(1)(c)(ii) (revised Article 6).  To constitute a bulk transfer under revised Article 6, a bulk sale "must not be in ordinary course of business" for "more than half of the seller's inventory, as measured by value on the date of the bulk-sale agreement."  *See* 3 James J. White & Robert S. Summers, UNIFORM COMMERCIAL CODE § 27-2 (5th ed. 2008).  The buyer

must also have notice the "seller will not continue in the same kind of business" after the bulk transfer. *Id.*

The deliveries pursuant to the **Invoices** and **Uninvoiced Deliveries** were a continuation of Black Diamond's sales in the ordinary course, which CIT Group authorized under the **Factoring Agreement**.

As a coal merchant, Black Diamond was in the business of selling coal, and the **Coal Supply Agreements** provided for periodic deliveries – not a single bulk transfer.

There is also no evidence in the record demonstrating Commodities had notice prior to Black Diamond's bankruptcy that Black Diamond intended to leave the coal industry. *See* U.C.C. § 6-102(1)(c)(ii). Commodities expected Black Diamond to continue selling and delivering coal as evidenced by the long-term **Coal Supply Agreements** Commodities executed. [Doc. 117, Exs. 6, 9; Doc. 158, E. Thompson Aff. at Exs. 9-13]. CIT Group cites no facts to the contrary.

Accordingly, CIT Group's claim Black Diamond transferred its inventory in bulk to Commodities fails.

CIT Group's conversion claim fails for another independent reason: CIT Group authorized the sales of Black Diamond's coal inventory to Commodities.

The general rule for a continuation of a security interest following the disposition of collateral is the security interest continues "notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest." N.Y.U.C.C. § 9-315(a)(1). A security interest in collateral does not continue if the secured party authorized the disposition of the collateral in the agreement establishing the security interest. *See* Official Comment 2 to U.C.C. § 9-315. An authorization allowing the disposition free of the security interest "may be implied from, among other things, the course of dealing between the parties and the usage of the trade." *Bank Brussels Lambert v. Credit Lyonnais*, 93 Civ. 6876, 2000 WL 174955, at *4 (S.D.N.Y. Feb. 15, 2000). Thus, in addition to

the terms of the security agreement, courts also analyze the facts and circumstances of the transactions at issue to determine whether the secured party authorized the disposition.

The agreements between Black Diamond and CIT Group and CIT Group's factoring of the **Invoices** demonstrate CIT Group authorized the sales to Commodities free of the CIT Group security interest.

In the **Factoring Agreement**, CIT Group and Black Diamond agreed each **Account** was "based on a bona fide sale and delivery of coal inventory made by [Black Diamond] in the ordinary course of business . . ."   [Doc. 117, Ex. 13 at CIT0283].   In determining whether to advance funds on any one of Black Diamond's accounts receivable, Mr. Lew stated he reviewed invoices to be "sure that there were no other sales that were not in the what we call the ordinary course of business, such as representing coal shipments or any other irregularities that may come up in the invoices that I may determine that it should not qualify for advance purposes." [Doc. 117, Ex. 15 at 29:3-9].   *See Bitzer-Croft Motors, Inc. v. Pioneer Bank & Trust Co.*, 401 N.E.2d 1340, 1346 (Ill. App. Ct. 1980) (security agreement authorized the sale of the aircraft, and secured creditor's loan officer acknowledged the aircraft would be sold; sale was therefore authorized under the UCC).   CIT Group factored each of the **Invoices** at issue in this action, and by doing so deemed the **Invoices** were all sales qualified for advance purposes, and therefore, sales in the ordinary course of business.

The **Credit and Inventory Security Agreement** contained almost identical language as contained in the **Factoring Agreement** explicitly authorizing sales "in the regular course of [Black Diamond's] business," and stating Black Diamond represented all **Inventory** "will be sold and shipped by [Black Diamond ]… only in the ordinary course of your business."   [Doc. 117, Ex. 30 at CIT0571].

CIT Group may not now claim the same coal sales authorized as in the "ordinary course of business" pursuant to the **Factoring Agreement** and which CIT Group factored with Black Diamond were not authorized and in the regular or ordinary course of Black Diamond's business

41

under the **Credit and Inventory Security Agreement**.  *See Draper v. Minneapolis-Moline, Inc.*, 241 N.E.2d 342, 345 (Ill. App. Ct. 1968) (financing agreement, which expressly gave authority to sell inventory in the ordinary course of business, intended inventory could be sold to buyer free and clear of security interest of the seller's creditor); *Finance America Commercial Corp. v. Econo Coach, Inc.*, 454 N.E.2d 1127, 1129 (Ill. App. Ct. 1983) (sale was authorized where "the inventory loan agreement clearly contemplated the possibility of the [sale] and provided for a continuing security interest in the proceeds resulting from such sale"); *Bitzer-Croft Motors,* 401 N.E.2d at 1348 (pursuant to the UCC, "a party who authorizes the sale cannot be heard to complain later that the authorization did not also run to its security interest in the collateral sold").

The **Credit and Inventory Security Agreement** also required all authorized inventory sales be factored to CIT Group with CIT Group's accounts receivable security interest attaching to the proceeds.  [Doc. 117, Ex. 30 at CIT0571].  The **Credit and Inventory Security Agreement** provides, "all proceeds of all sales (including cash, accounts receivable, checks, notes, instruments for the payment of money and similar proceeds) are handled in accordance with the terms of the [Factoring Agreement]."  *Id.*  In accordance with these terms, CIT Group approved the sales of coal pursuant to the **Invoices** as sales qualified for advances and factoring.  As previously discussed, CIT Group's lien was not jeopardized.  CIT Group received "new value, in the form of accounts receivable, to replace the transferred inventory."  *Amarillo Nat'l Bank*, 991 F.2d at 277.

Commodities qualifies as a BIOCB as defined by N.Y.U.C.C. § 1-201(b)(9).  As a result, CIT Group's inventory lien was severed at the time the coal was delivered to Commodities, and Commodities acquired the coal free of any inventory security interest CIT Group may have had on Black Diamond's coal inventory.  N.Y.U.C.C. § 9-320(a).  Commodities' possession of the coal delivered pursuant to the **Invoices** and the **Uninvoiced Deliveries** was not in violation of any possessory interest of CIT Group.  Therefore, Commodities did not convert any coal.

The relief requested in CIT Group's Sixth Claim for Relief alleging conversion may not be granted as a matter of law.  CIT Group cannot prevail under the Sixth Claim for Relief and judgment for Commodities is proper.

First Claim for Relief – Breach of Contract, Second Claim for Relief – Money Due on Account, Third Claim for Relief – Account Stated against Commodities, Fourth Claim for Relief – Unjust Enrichment against Commodities

CIT Group's contract and quasi-contract claims for relief also fail as a matter of law. These claims are subject to Commodities' defenses under the N.Y.U.C.C. and the terms of the **Coal Supply Agreements**, including, but not limited to Commodities' right to recoup and/or set-off amounts owed by Black Diamond to Commodities based on the **Termination and Liquidated Damages** incurred by Commodities after Black Diamond defaulted on its obligations under the **Netting and Set-off Provision** in the **Coal Supply Agreements**.

Factoring agreements are generally subject to the terms of Article 9 of the UCC.[27]  CIT Group, pursuant to the terms of the **Factoring Agreement**, was Black Diamond's assignee for all accounts receivable arising under the **May 2006 Coal Supply Agreement** and the other **Coal Supply Agreements** with Commodities.

An assignor can assign "only what he has" and "is subject to limitations imposed by the terms of that [contract creating the right] and to defenses which would have been available against the obligee had there been no assignment."  RESTATEMENT (SECOND) OF CONTRACTS § 336 cmt. b (1981).  As a result, "'an assignee never stands in any better position than his assignor.  He is subject to all the equities and burdens which attach to the property assigned because he receives no more ... than his assignor.'" *Septembertide Publg., B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 682 (2d Cir. 1989) (quoting *International Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121, 126 (1975)).  CIT Group's claims are subject to the same defenses that would have been available to Commodities as against Black Diamond.  *See, e.g.,*

---

[27]       *See, e.g., GMAC Commercial Credit LLC v. Springs Indus., Inc.*, 171 F. Supp. 2d 209, 213-214 (S.D.N.Y. 2001).

*GMAC Commercial Credit LLC v. Springs Indus., Inc.*, 171 F. Supp. 2d 209, 213-214 (S.D.N.Y. 2001) (factor subject to same contractual remedies in defense of claim as assignor).

Section 9-404 of the Uniform Commercial Code codifies these principles:

> (a) Assignee's right subject to terms, claims and defenses; exceptions. Unless an account debtor has made an enforceable agreement not to assert defenses or claims . . . the rights of an assignee are subject to:
>
> (1) all terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and
>
> (2) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee.

N.Y.U.C.C. § 9-404(a).

Commodities' rights of recoupment and set-off trump any claims by CIT Group.

Commodities may recoup damages it suffered resulting from Black Diamond's failure to deliver the required tonnages of coal and recoup the **Termination and Liquidated Damages** based on Commodities' termination of the **Coal Supply Agreements** following Black Diamond's involuntary Chapter 11.   N.Y.U.C.C. § 9-404(a)(1) expressly permits a defense of recoupment against the assignee of rights under a contract, such as CIT Group.   Section 9-404(a)(1) preserves this right of recoupment regardless of whether the contract at issue refers to recoupment.   However, the **Coal Supply Agreements** and the **Consent Agreement** specifically preserved Commodities' right to recoup.

Courts have routinely held a third party's right of recoupment is not subordinate to an accounts receivable lien such as that granted to CIT Group by Black Diamond.   *See, e.g., National City Bank v. Northwest v. Columbian Mut. Life Ins. Co., et al.*, 282 F.3d 407, 410 (6th Cir. 2002) ("[t]here is no authority for the proposition that a perfected assignment to a third person takes precedence over a right of recoupment created between the original contracting parties in their contract"); *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1403-04 (9th Cir. 1996) (doctrine of recoupment does not impair third party's security interest, but merely

serves to determine the value of the claim in which the third party holds an interest, even if result is claim is worthless); *First National Bank of Boston v. Thomson Consumer Elecs., Inc.*, 84 F.3d 397, 401 (11th Cir. 1996) (doctrine of recoupment applied against claims by bank for recovery under assigned contract without regard to when security interest was perfected); *In re Bill Heard Enterprises, Inc.*, No. 08-83029, 2009 WL 416313 (Bankr. N.D. Ala. Feb. 12, 2009); *In re Communication Dynamics, Inc.*, 300 B.R. 220 (Bankr. D. Del. 2003);

The bankruptcy court in *Communication Dynamics* was called upon to determine whether a lender's lien on substantially all debtor's assets trumped the rights of a creditor to set off or recoup sales credits it was due from debtor. The court held a right of recoupment is not subordinate to any security interest a lender may have in the debtor's inventory or accounts receivable, such as that asserted by CIT Group. *Communication Dynamics*, 300 B.R. at 227. In holding the lender's security interest did not trump the creditor's recoupment rights, the court looked to U.C.C. § 9-404(a)(1):

> [u]nless an account debtor has made an enforceable agreement not to assert defenses or claims, and subject to subsections (b) through (e), the rights of an assignee [including a lender secured by inventory] are subject to:
>
> (1) all terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and . . .

*Communication Dynamics*, 300 B.R. at 227.

Each of the **Coal Supply Agreements** included the **Netting and Set-off Provision**, which set forth unambiguously "[a]ll payment obligations hereunder and under any transaction between the Parties in the same Commodity may be offset against each other, set off or recouped." *See e.g.,* [Doc.117, Ex. 6 at CONSTELLATION-0003851; Ex. 9 at CIT0550]. Under N.Y.U.C.C. § 9-404(a)(1), CIT Group's right to payment, even if secured by an accounts receivable lien, is subordinate to Commodities' right to recoup its damages. *Communication Dynamics*, 300 B.R. at 227. CIT Group does not dispute Commodities has a right of

recoupment under N.Y.U.C.C. § 9-404(a)(1) or the **Coal Supply Agreements**.  CIT Group concedes, as Black Diamond's assignee, it is "subject to the recoupment doctrine."  [Doc. 153 at 39 n.25].

Each **Coal Supply Agreement** constituted a single integrated transaction for recoupment purposes under N.Y.U.C.C. § 9-404(a)(1).  [Doc. 157, Second P. Thompson Aff. at ¶¶ 15, 21].  **Invoices** arising under a given **Coal Supply Agreement** all bore the same price, reflected coal shipped on a periodic basis according to the terms set out in the **Coal Supply Agreement** and included extended payment terms – all terms which could not change absent a formal amendment to the agreement.  *See e.g.*, Doc. 117, Ex. 6 at CONSTELLATION-0003852. The undisputed facts show each **Coal Supply Agreement** established a total quantity of coal to be sold under the agreement and a fixed price per ton for coal under the agreement, constituting a single integrated agreement to buy and sell a specified aggregate amount of coal at a set price.  [Doc. 157, Second P. Thompson Aff. at ¶ 19].

For example, the **Coal Supply Agreement** having reference number BLJ08(TP)0002 set forth the total amount of coal delivered by Black Diamond to Commodities (1,116,000 tons); the price per ton Commodities would pay for the coal delivered ($48.25 per ton of coal in 2008 and $50.00 per ton of coal in 2009); the delivery term was January 1, 2008, through December 31, 2009; and all the rights and remedies of both parties under the **Coal Supply Agreement**. [Doc. 117, Ex. 6].

The facts demonstrate Commodities and Black Diamond's intent was each **Coal Supply Agreement** would be a single integrated agreement and the remedy provisions contained therein apply across the specific agreement and across all **Coal Supply Agreements**.  [Doc. 157, Second P. Thompson Aff. at ¶ 21].

Commodities' right of recoupment arises on an agreement-by-agreement basis, eliminating $9,036,629.66 of the $9,978,549.52 CIT Group claims is due on the **Invoices** and **Uninvoiced Deliveries**.

46

Commodities explicitly identified the particular **Coal Supply Agreements** under which it may recoup and how its recoupment rights work. [Doc. 117, Ex. 42]. Commodities may recoup its damages by calculating **Termination and Liquidated Damages** separately by each **Coal Supply Agreement**, as follows:

**BLJ07(TP)0010:** Three **Invoices** (#1-001230, #1-001238, and #12-001131) arose under **Coal Supply Agreement** Ref. No. BLJ07(TP)0010. [Doc. 117, Ex. 26]. CIT Group seeks $927,440.50 for these three shipments of coal. [Doc. 117, Ex. 42]. Commodities incurred $3,090,208.33 in **Termination Damages** for coal Black Diamond was required to deliver for the balance of the contract term under this agreement, thereby eliminating the total amount owed to CIT Group under this agreement. *Id.* In addition, Black Diamond failed to deliver $568,218.75 worth of coal during February 2008 under BLJ07(TP)0010 causing **Liquidated Damages**. *Id.* Accordingly, Commodities incurred $3,658,427.08 in total damages pursuant to contract BLJ07(TP)0010, which, when recouped against the amounts owed for the delivered coal, leaves a net balance in favor of Commodities in the amount of $2,730,986.58.

**BLJ08(TP)0002:** Six **Invoices** (#1-001211, #1-001234, #1-001237 #1-001242, #1-001233, #2-001248) and two **Uninvoiced Deliveries** of coal arose under the **Coal Supply Agreement** Ref. No. BLJ08(TP)0002. [Doc. 117, Ex. 26]. CIT Group seeks $2,435,031.13 for these eight shipments of coal. [Doc. 117, Ex. 42]. Commodities incurred $22,508,583.33 in **Termination Damages** for coal Black Diamond was required to deliver for the balance of the contract term under this agreement, which eliminates any amount due CIT Group. *Id.* Black Diamond failed to deliver $1,540,700.00 worth of coal during February 2008 under this contract causing an additional amount of **Liquidated Damages**. *Id.* Accordingly, Commodities incurred $24,049,283.33 in total damages pursuant to contract BLJ08(TP)0002, which, when recouped against the amounts owed for the delivered coal, leaves a net balance in favor of Commodities in the amount of $21,614,252.20. *Id.*

**BLJ08(TP)0001:** Three **Invoices** (#1-001209, #1-001213, and #1-001226) arose under **Coal Supply Agreement** Ref. No. BLJ08(TP)0001.  [Doc. 117, Ex. 26].  CIT Group seeks a total of $1,137,504.85 for these shipments of coal.  [Doc. 117, Ex. 42].  Commodities incurred $36,398,726.85 in **Termination Damages** for coal Black Diamond was required to deliver for the balance of the contract term under this agreement, which eliminates any amount due CIT Group.  *Id.*  Black Diamond failed to deliver $2,118,350.00 worth of coal during January and February 2008 under BLJ08(TP)0001 causing additional **Liquidated Damages**.  *Id.* Accordingly, Commodities incurred $38,517,076.85 in total damages pursuant to contract BLJ08(TP)0001 which, when recouped against the amounts owed for the delivered coal, leaves a net balance in favor of Commodities in the amount of $37,379,572.00.  *Id.*

**BLJ08(TP)0004:** Five **Invoices** (#1-001192, #1-001212, #1-001217, #1-001239, and #2-001246) arose under the **Coal Supply Agreement** Ref. No. BLJ08(TP)0004.  [Doc. 117, Ex. 26].  CIT Group seeks a total of $2,434,767.67 for these shipments.  [Doc. 117, Ex. 42]. Commodities incurred $12,370,370.37 in **Termination Damages** for coal Black Diamond was required to deliver for the balance of the contract term under this agreement, which eliminates any amount due CIT Group.  *Id.*  Black Diamond failed to deliver $1,118,227.50 worth of coal during February 2008 under BLJ08(TP)0004, causing **Liquidated Damages** under this agreement.  *Id.*  Accordingly, Commodities incurred $13,488,597.87 in total damages pursuant to contract BLJ08(TP)0004 which, when recouped against the amounts owed for the delivered coal, leaves a net balance in favor of Commodities in the amount of $11,053,830.20.  *Id.*

**BLJ07(TP)0004:** Three **Uninvoiced Deliveries** arose under **Coal Supply Agreement** Ref. No. BLJ07(TP)0004.  [Doc. 117, Ex. 7 at CONSTELLATION-0005426].  CIT Group seeks a total of $1,680,615.51 for these shipments.  [Doc. 117, Ex. 42].  Commodities incurred $11,002,331.00 in **Termination Damages** for coal Black Diamond was required to deliver for the balance of the contract term under this agreement, which eliminates the amount due to CIT Group under this agreement.  *Id.*  Black Diamond failed to deliver $250,000.00 of coal during

January 2008 under BLJ07(TP)0004, causing more **Liquidated Damages**. *Id.* Accordingly, Commodities incurred $11,252,331.00 in total damages pursuant to contract BLJ07(TP)0004 which, when recouped against the amounts owed for the delivered coal, leaves a net balance in favor of Commodities in the amount of $9,571,715.49. *Id.*

**BLJ07(TP)0009:** One **Invoice** (#12-001129) arose under **Coal Supply Agreement** Ref. No. BLJ07(TP)0009. [Doc. 117, Ex. 26]. CIT Group seeks a total of $457,598.36 for this shipment of coal. [Doc. 117, Ex. 42]. Black Diamond failed to deliver $421,270.00 of coal during February 2008 under BLJ07(TP)0009. *Id.* Accordingly, Commodities total damages consist of **Liquidated Damages** in the amount of $421,270.00 pursuant to contract BLJ07(TP)0009, leaving a net balance in favor of CIT Group in the amount of $36,328.36. *Id.* Commodities can set off the remaining $36,328.36 owing on Invoice #12-001129.

CIT Group contends Commodities should not be allowed to recoup because Commodities breached the **Coal Supply Agreements** by failing to pay the **December 22, 2007 Invoices** totaling $417,248.47. [Doc. 153 at 37-38]. CIT Group's claims of breach are not supported by the record.

Pursuant to the sixty-day payment terms for all deliveries by Black Diamond to Commodities, Commodities' obligation to pay the **December 22, 2007 Invoices** did not arise until after Black Diamond had stopped performing under the **Coal Supply Agreements** and Black Diamond's Chapter 11 case had already commenced. [Doc. 156, Second Hoskins Aff. at ¶ 8; *see, e.g.,* Doc. 117, Ex. 9 at CIT0540-0541; Ex. 6 at CONSTELLATION-0003841]. Black Diamond did not dispute the sixty-day payment terms and confirmed to CIT Group in writing the **December 22, 2007 Invoices** would be due on February 22, 2008.

In an electronic message exchange dated February 8, 2008, between David Hegger of Black Diamond and Brigit Shaffer, scheduler at Commodities, Commodities confirmed it would follow the sixty-day payment terms and pay the **December 22, 2007 Invoices** on February 22, 2008, sixty days after the date of the invoices. These e-mail messages were forwarded to CIT

Group.   [Doc. 158, E. Thompson Aff., Ex. 1 at CONSTELLATION-0004204-4205].   Black Diamond never contested payment of the **December 22, 2007 Invoices** on the same sixty-day terms which covered the other invoices issued by Black Diamond to Commodities.   [Doc. 156, Second Hoskins Aff. at ¶ 10; Doc. 158, E. Thompson Aff., Ex. 1 at CONSTELLATION-0004204-4205].

Black Diamond never issued a written notice to Commodities asserting any event of default under the **December 22, 2007 Invoices** existed.   CIT Group may not manufacture an event of default when Black Diamond confirmed payment was not due until February 22, 2008, and when Black Diamond never provided written notice to Commodities that it had failed to pay the **December 22, 2007 Invoices**.   *See* Doc. 157, Second P. Thompson Aff. at ¶ 24.

Black Diamond's insolvency on February 19, 2008, constituted an event of default under each of the **Coal Supply Agreements** which authorized Commodities to suspend performance of its obligations under the **Coal Supply Agreements** on and after February 19, 2008, without notice to Black Diamond.

CIT Group also claims Commodities breached the **Coal Supply Agreements** by failing to provide an amended guaranty from Constellation for each of the **Coal Supply Agreements** executed subsequent to the **May 2006 Coal Supply Agreement**.   [Doc. 119 at 17, 47].

Black Diamond never issued any event of default notice to Commodities.   Black Diamond never suspended performance under the **Coal Supply Agreements** due to any claimed breach by Commodities for failure to provide an amended guaranty.   Black Diamond never issued a notice of termination under the procedures prescribed by Section 12 of the **Coal Supply Agreements**.   Black Diamond never claimed Commodities was in breach of any of the **Coal Supply Agreements**.   Black Diamond continued to perform under the **Coal Supply Agreements** until Black Diamond advised Commodities it would no longer be supplying Commodities with coal and was ultimately forced into Chapter 11.   [Doc. 157, Second P. Thompson Aff. at ¶¶ 25, 31].

In addition to the factual infirmities of CIT Group's claims of breach, CIT Group also lacks standing to allege a breach of agreements to which it was not a party. *Monahan v. Pena*, No. 08-CV-2258, 2009 WL 2579085, at *3 (E.D.N.Y. Aug. 18, 2009).  CIT Group was not a party to any agreement with Commodities.  Therefore, as a threshold matter, CIT Group lacks standing to assert Commodities breached any agreement with Black Diamond. *See, e.g., Caravella v. City of New York*, 79 F. App'x. 452, 453 (2d Cir. 2003) (no individual standing to bring breach of contract claim were plaintiff was not a party to contract); *Sopasis Const., Inc. v. Solomon*, 233 A.D.2d 385, 387 (N.Y. App. Div. 1996) (ruling summary judgment was proper because plaintiff was not party to contract).

Based on the reasons set forth above, Commodities may recoup under the **Coal Supply Agreements** and under N.Y.U.C.C. § 9-404(a)(1) for the **Termination Damages** and the **Liquidated Damages** incurred upon the termination of six of the **Coal Supply Agreements** for which eighteen **Invoices** and five **Uninvoiced Deliveries** arise.

Commodities' recoupment right is not a setoff as argued by CIT Group. *In re Ramp Chevrolet, Inc.*, No. 09–77513, 2010 WL 5348717, at *10 (Bankr. E.D.N.Y. Dec. 21, 2010) (reduction of amounts owed pursuant to a contract providing for a single net termination amount "is not a setoff, and is enforceable as a matter of law and equity.").  Like General Motors in *Ramp Chevrolet*, Commodities has the contractual right of recoupment and all recoupments under the **Coal Supply Agreements** are enforceable.

In *Bill Heard*, plaintiff, a financing company, sued General Motors in an attempt to force General Motors to turn over funds held in its accounts for the debtor. *Bill Heard*, 2009 WL 416313, at *1.  The financing company, in exchange for providing financing to the debtor, obtained a security interest in all debtors' motor vehicle inventory, parts inventory and accounts. *Id.*  Just prior to the bankruptcy General Motors notified the debtor it was in breach of certain dealer franchise agreements which included a netting, set-off and recoupment provision similar to provisions at issue in this proceeding. *Id.* at *3.

51

The financing company in *Bill Heard* argued it had a perfected security interest giving it priority over any recoupment claims or set-off rights asserted by General Motors. *Id.* The bankruptcy court disagreed and quoting the Supreme Court stated, it is "well settled that a 'bankruptcy defendant can meet a plaintiff-debtor's claim with a counterclaim arising out of the same transaction, at least to the extent the defendant merely seeks recoupment.' " *Id.* at *4 (quoting *Reiter v. Cooper*, 507 U.S. 258, 265 n.2 (1993)). The doctrines of recoupment and set-off constitute exceptions to the "general rule that all unsecured creditors of a bankruptcy stand on equal footing for satisfaction. If a right of recoupment or set-off exists under applicable state law, a creditor will be allowed a preference over other creditors." *Id.* (Internal quotations and footnote omitted.). Ultimately, the financing company had no priority right because it "would be inequitable to allow the debtors, or [the financing company], to obtain the funds owed under the dealership franchise agreements without first allowing [General Motors] to recoup its damages arising from the dealerships' breaches of the same agreements." *Id.* at *6.

The creditor in *Communication Dynamics* had the right to recoup sales credits against future equipment sales, because "both are part of a single integrated business transaction and are sufficiently related to one another to permit recoupment." *Communication Dynamics*, 300 B.R. at 227. The court in *Bill Heard* reached a similar conclusion despite the fact there were several dealer franchise agreements. *Bill Heard*, 2009 WL 416313, at *6. *See also General Motors Corp. v. Perry Gas Cos., Inc.*, 279 B.R. 824, 825-26 (S.D. Tex. 2002) (for purposes of recoupment multiple events such as periodic natural gas deliveries and related consequential damages arose out of a single transaction).

Each of the **Coal Supply Agreements** constitutes a "single integrated agreement" pursuant to which Commodities can recoup. The recoupment arises from a single integrated agreement. *Communication Dynamics*, 300 B.R. at 227. Accordingly, Commodities may recoup $9,036,629.66 owed by Black Diamond against the $9,978,549.52 CIT Group asserts remains due pursuant to the **Invoices** and **Uninvoiced Deliveries**.

Commodities is also entitled to set off amounts Black Diamond failed to pay for coal delivered by Commodities, as well as other damages incurred as a result of Black Diamond's default under the **Coal Supply Agreements**.  As noted above, during the months of January and February 2008, pursuant to two contracts,[28] Commodities delivered to Black Diamond 54,548.54 tons of coal for which Commodities has not been paid.[29]  [Doc. 118, Hoskins Aff. at ¶¶ 7, 8, 9; Doc. 117, Ex. 7 at CONSTELLATION-0005427; Ex. 42].  It is undisputed Black Diamond received the coal and did not contest the invoices sent by Commodities totaling $2,758,268.51. *Id.*

In January and February 2008, Black Diamond and Commodities also directly booked out physical delivery obligations which resulted in a net amount due to Commodities by Black Diamond totaling $1,604,000.00.  [Doc. 118, Hoskins Aff. at ¶¶ 11, 12; Doc. 117, Ex. 7 at CONSTELLATION-0005427; Ex. 42].  Commodities invoiced Black Diamond for these amounts, and Black Diamond did not dispute these invoices.

In accordance with the **Coal Supply Agreements** and the provisions of N.Y.U.C.C. § 9-404(a)(2), Commodities is entitled to set off these amounts against the remaining **Invoices** and the amounts owing totaling $941,919.86,[30] for which it does not have a direct recoupment claim arising under a **Coal Supply Agreement**.  N.Y.U.C.C. § 9-404(a)(1)-(2).  [Doc. 117, Ex. 9 at CIT0550; ex. 42].

Commodities is entitled to set off against the following:

- **Invoice** #1-001208 arose under **Coal Supply Agreement** Ref. No. BLJ07(TP)0013. [Doc. 117, Ex. 26 at CONSTELLATION-0004799].  CIT Group seeks a total of $486,307.21 for this shipment of coal.  [Doc. 117, Ex. 42].

---

[28]    Ref. No. BLJ08(TS)0003 and BLJ08(TS)0004.  [Doc. 117, Ex. 7 at CONSTELLATION-0005427.

[29]    The tons of coal delivered by Commodities became part of Black Diamond's inventory in which CIT Group had a security interest.  The coal may have been resold and factored by Black Diamond, thereby allowing CIT Group's accounts receivables lien to attach to the proceeds of the transactions.  In either event, both Black Diamond and CIT Group received a benefit from the delivered coal.  It is undisputed Black Diamond failed to pay for these tons.

[30]    This figure represents the difference between the $9,978,549.52 CIT Group asserts remains due pursuant to the **Invoices** and **Uninvoiced Deliveries** and the $9,036,629.66 Commodities may recoup.

- Seven **Invoices** #12-001154, #12-001155, #12-001156, #12-001157, #12-001158, #12-001159, and #12-001160 ("**December 22, 2007 Invoices**") arose under **Coal Supply Agreement** Ref. No. BLJ07(TP)0014.    [Doc. 117, Ex. 26 at CONSTELLATION-0004832, 0004844, 0004834, 0004836, 0004838, 0004840, 0004842].  CIT Group seeks a total of $417,248.47 for these seven shipments.  [Doc. 117, Ex. 42].

- Invoice #11-001108 arose under the **Coal Supply Agreement** Ref. No. BLJ07(TS)0007.  [Doc. 117, Ex. 26 at CONSTELLATION-0004827].  CIT Group seeks a total of $2,035.82 as a minimum weight charge.  [Doc. 117, Ex. 42].

- Invoice #12-001129 arose under the **Coal Supply Agreement** Ref. No. BLJ07(TP)0009.  [Doc. 117, Ex. 26 at CONSTELLATION-0004828].  CIT Group seeks a total of $457,598.36 for this shipment.  [Doc. 117, Ex. 42].  Commodities may recoup $421,270.00 under this invoice because of Black Diamond's failure to deliver coal during February 2008, leaving a balance of $36,328.36 for Invoice #12-001129.  *Id.*

CIT Group seeks a total of $941,919.86 pursuant to these ten **Invoices**.  [Doc. 117, Ex. 42].  Black Diamond failed to pay invoices for coal Commodities delivered to Black Diamond totaling $2,758,268.51.  Black Diamond also failed to pay **Invoices** totaling $1,604,000 for the bookout transactions effected by Commodities and Black Diamond in January and February 2008.  *Id.*  Accordingly, Commodities incurred $4,362,268.51 in damages which may be set off against the $941,919.86 CIT Group seeks under the ten **Invoices**.  *Id.*

CIT Group does not dispute the uncontested fact Commodities has a contractual right to offset outstanding payments owed to it by Black Diamond against those remaining **Invoices** not covered by its recoupment rights.  The uncontested facts establish CIT Group never rejected a Commodities **Invoice** from Black Diamond on any basis, including the set-off rights of which CIT Group had knowledge.  [Doc. 117, Ex. 10, Hudgens Dep. at 36:17-20; Ex. 3, Franklin Dep. at 63:10-65:14, 68:12-69:13, 70:9-71:1, 74:13-75:14, 81:14-83:18, 84:11-85:23; Ex. 12, Hegger Dep. at 36:7-37:16; Ex. 9 at CIT0550; Ex. 22 at CIT 1752, 1754, 1891-1892].

CIT Group also consented to the practice of bookouts – the practice of financially setting off delivery obligations between Commodities and Black Diamond.  [Doc. 117, Ex. 12, Hegger Dep. at 57:18-59:18, 60:15-19; Ex. 15, Lew Dep. at 115:20-121:9, 122:10-125:5; Ex. 35 at CIT

5811-5812; Ex. 1, Savage Dep. at 24:12-33:6, 58:17-60:21; Ex. 16, Funk Dep. at 70:6-16; Ex. 21, Hoskins Dep. at 42:14-51:9; Ex. 35 at CIT 5811-12].

Commodities is entitled to set off the $4,362,268.51 in damages it incurred based on its own deliveries of coal to Black Diamond and the bookout transactions against the $941,919.86 CIT Group seeks pursuant to the **Invoices**.  Accordingly, because Commodities may properly recoup or, alternatively set off amounts which far exceed any amounts owed pursuant to the **Invoices** and **Uninvoiced Deliveries**, CIT Group cannot prevail under the First, Second, Third and Fourth Claims for Relief (to the extent based on these amounts due) and judgment for Commodities is proper.

Fifth Claim for Relief – Violation of a Security Interest and Lien

CIT Group's Fifth Claim for Relief alleges violation of a security interest and lien because Commodities paid the **Amendment Amounts** to Black Diamond rather than to CIT Group. [Doc. 153 at 44].  CIT Group's Fifth Claim for Relief fails as a matter of law.

The **Factoring Agreement** granted CIT Group a security interest in all of Black Diamond's **Accounts**.  The term **Accounts** was defined under the **Factoring Agreement** as "all accounts arising from your sales of coal inventory."   [Doc. 117, Ex. 13 at CIT0282]. Pursuant to the **Factoring Agreement**, Black Diamond sold and assigned to CIT Group only "accounts arising from [Black Diamond's] sale of coal inventory…"  *Id.*

The **Amendment Amounts** do not constitute "accounts" under the terms of the **Factoring Agreement** because they do not "arise from" the sale of Black Diamond's coal inventory.   While the **Amendment Amounts** may "relate to" coal sales – every transaction between Black Diamond and Commodities related in some direct or indirect way to the sale of coal – not a single ounce of coal was delivered to Commodities for the payment of any of the **Amendment Amounts**, nor was any account receivable generated from any **Amendment Amount**.  The **Amendment Amounts** do not arise from a sale of Black Diamond's coal.

Courts interpreting contractual provisions containing "arising from" language have narrowly construed the term. *Golden Pacific BanCorp. v. F.D.I.C.*, 273 F.3d 509, 516 (2d Cir. 2001) (interpreting "arising from"); *see also Phillips v. Audio Active Ltd.*, 494 F.3d 378, 389 (2d Cir. 2007) (interpreting "arise out of"); *Coregis Ins. Co. v. American Health Foundation, Inc.,* 241 F.3d 123, 128 (2d Cir. 2001) (interpreting "arising out of").

CIT Group attempts to expand the scope of the **Factoring Agreement** to include the **Amendment Amounts**. Compare the quote in CIT Group's Memorandum, Doc. 119 at 8 (adding bracketed language "which term includes all monies arising out of the May 2006 Agreement and all other agreements involving the sale of coal"), with section 2 of the Consent Agreement, Doc. 117, Ex. 17 at CIT 0306; and CIT Group's Memorandum at 9 with section 1 of the Consent Agreement, Doc. 117, Ex. 13 at CIT0282.

In the Memorandum, CIT Group states "the amendment payments arise from the sales of coal inventory (indeed, they were payments in consideration for Black Diamond's agreement to amend the May 2006 Agreement that involved the sale of more than 2.5 million tons of coal inventory and the U.C.C.'s definition of 'Account' includes the right to payment of a monetary obligation *whether or not* earned by performance)." [Doc. 119 at 38-39] (Emphasis in original.). The **Amendment Amounts** did not arise from Black Diamond's sale of coal inventory. The payments arose from the modification of the terms of the **May 2006 Coal Supply Agreement**.

According to the undisputed facts, no coal was sold or delivered in exchange for any of **Amendment Amounts**, nor was any invoice transmitted from Black Diamond to Commodities reflecting any such sales. [Doc. 117, Exs. 37, 38, 39, 40; Doc. 156, Second Hoskins Aff. at ¶ 29].

Because the **Amendment Amounts** do not "arise from" and were not caused by a sale of coal inventory, they do not constitute "accounts" assigned to CIT Group under the **Factoring Agreement**. Accordingly, based on the terms of the **Factoring Agreement**, CIT Group did not have a right to any of the **Amendment Amounts**.

Furthermore, the **Consent Agreement** executed by Commodities required the deposit of payments from Commodities on account of transactions involving Black Diamond into the Bank of New York Account.  [Doc. 117, Ex. 17 at CIT0309; Ex. 3, Franklin Dep. at 115:2-19].  The payments transferred by Commodities pursuant to Amendment Nos. 2, 3 and 4 were deposited into the Bank of New York Account set forth in the **Consent Agreement**.  [Doc. 117, Ex. 17 at CIT0309; Ex. 41 at CONSTELLATION-0005136, 0005350, 0005352; Ex. 39 at CIT 00021; Ex. 40 at CONSTELLATION-0003749; Ex. 3, Franklin Dep. at 41:11-43:10, 45:6-46:18].

In contrast to the factored **Invoices**, no instructions were given directing Commodities to pay the **Amendment Amounts** for the benefit of CIT Group.  Commodities followed Black Diamond's instructions to wire-transfer the funds identified in the **Amendments** and transmitted three of the payments to the Bank of New York Account set forth in the **Consent Agreement**. Black Diamond sent Commodities explicit instructions to pay these **Amendment Amounts** into the Bank of New York Account and Commodities did so.  [Doc. 157, Second P. Thompson Aff. at ¶¶ 27-30].  There is no evidence Black Diamond or any other entity instructed Commodities to pay the **Amendment Amounts** into any other bank account.

Also problematic for CIT Group's position is CIT Group did not advance any cash pursuant to the **Amendments**, nor were any invoices created or factored by Black Diamond pursuant to the **Amendments**.  [Doc. 117, Ex. 2, Sergent Dep. at 161:7-165:9; Ex. 12, Hegger Dep. at 45:18-48:11; Ex. 15, Lew Dep. at 140:1-6].  CIT Group's witnesses' testimony and accounting records confirm CIT Group did not factor or advance any funds against the **Amendment Amounts**.  CIT Group has suffered no damages related to the **Amendments**. [Doc. 117, Ex. 3, Franklin Dep. at 230:19-231:6, 232:22-233:7, 233:8-18; Ex. 32; Ex. 48].

CIT Group's proof of claim failed to include any claim for the **Amendment Amounts**. The proof of claim did seek the repayment of amounts advanced pursuant to the **Invoices**. [Doc. 117, Ex 3, Franklin Dep. at 230:19-231:6, 232:22-233:7; Ex. 48].  CIT Group never amended its proof of claim to include the **Amendment Amounts**.

The evidence demonstrates CIT Group consented to Black Diamond's receipt of the payment made pursuant to **Amendment No. 1**.  In an e-mail dated October 31, 2006, CIT Group executives were notified of the $1.5 million prepayment by Commodities, Black Diamond requested use of the $1.5 million prepayment, and Black Diamond had instructed Commodities to deposit those funds into Black Diamond's "Operating Account."  [Doc. 117, Ex. 29 at CIT 1189; Ex. 15, Lew Dep. at 111:13-113:4; Ex. 3, Franklin Dep. at 149:10-150:22; Ex. 12, Hegger Dep. at 47:2-49:4; Ex. 25 at CIT 5850].

Rather than object to Black Diamond's use of the $1.5 million paid pursuant to **Amendment No. 1**, CIT Group executed Waiver No. 2 to Black Diamond's loan agreements, and allowed Black Diamond to keep and use the Constellation payment to "assist in meeting Black Diamond's short term liquidity needs."  [Doc. 117, Ex. 29 at CIT 1189-1190; Ex. 28].  One of the stated purposes of CIT Group in a Credit Approval Form dated 10/23/2006, was "permit the [Constellation] prepayment noted above (not in the ordinary course of business)."  [Doc. 117, Ex. 25 at CIT 5850].  Transactions not in the "ordinary course" of Black Diamond's business were excluded from both the **Factoring Agreement** and the **Credit and Inventory Security Agreement**.  [Doc. 117, Ex. 13 at CIT0283; Ex. 30 at CIT 0571].

Because CIT Group consented to Black Diamond's use of the "Constellation prepayment" made pursuant to **Amendment No. 1**, CIT Group waived any claim to those funds.

Finally, the **Amendment Amounts** do not meet the definition of "accounts" under N.Y.U.C.C. § 9-102(a)(2).  The N.Y.U.C.C. defines an "account" as:

> a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, or (viii) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a State, or person licensed or authorized to operate the game by a State or governmental unit of a State.  The term includes

health-care-insurance receivables. The term does not include (i) rights to payment evidenced by chattel paper or an instrument, (ii) commercial tort claims, (iii) deposit accounts, (iv) investment property, (v) letter-of-credit rights or letters of credit, or (vi) rights to payment for money or funds advanced or sold, other than rights arising out of the use of a credit or charge card or information contained on or for use with the card.

N.Y.U.C.C. § 9-102(a)(2).

The **Amendment Amounts** do not fall into any of the eight subparts of the N.Y.U.C.C. definition of an "account.  The **Amendment Amounts** are not rights to payment of a monetary obligation for property, services, a policy of insurance, a secondary obligation, energy, or use of a vessel, nor are they payment obligations arising out of the use of a credit card or as winnings in a lottery.  Rather, the Amendment Amounts were payments in consideration for Black Diamond's modifications to the contractual terms of the **May 2006 Coal Supply Agreement**. [Doc. 156, Second Hoskins Aff. at ¶ 28].

Under the **Amendments**, Commodities paid Black Diamond for contractual modifications to pricing, shipping and quantity terms; not for the actual sale of coal.  [*Id.*; Doc. 117, Ex. 37 at CONSTELLATION-0003732; Ex. 38 at CONSTELLATION-0003735-0003736; Ex. 39 at CIT 000020-00021; Ex. 40 at CONSTELLATION-0003748-0003749; Ex. 1, Savage Dep. at 84:21-85:13; Ex. 3, Franklin Dep. at 41:11-43:10].  The **Amendment Amounts** do not meet the definition of "accounts" under the N.Y.U.C.C.

Because the **Amendment Amounts** do not constitute accounts under N.Y.U.C.C. § 9-102(a)(2), CIT Group's reliance on N.Y.U.C.C. § 9-406 also fails.

Under N.Y.U.C.C. § 9-406, an account debtor (Commodities) may properly pay the assignor (Black Diamond) payment intangibles (such as the **Amendment Amounts**) until, but not after, the account debtor (Commodities) receives notification, authenticated by the assignor (Black Diamond) or the assignee (CIT Group), the amount due has been assigned and payment is to be made to the assignee (CIT Group).  N.Y.U.C.C. § 9-406(a); *see also General Motors*

*Acceptance Corp. v. Clifton-Fine Cent. School Dist.*, 85 N.Y.2d 232, 237 (1995); UCC § 9-318(3).

The record shows Black Diamond never assigned the **Amendment Amounts** to CIT Group, never told Commodities the **Amendment Amounts** were sold and assigned to CIT Group, or that the Amendment Amounts were to be paid to the Wachovia Bank Account included on the **Invoices**.  [Doc. 117, Ex. 3, Franklin Dep. at 115:2-19; Ex. 17 at CIT0309; Doc. 157, Second P. Thompson Aff. at ¶ 26].  Black Diamond did not send Commodities any invoices for the **Amendment Amounts**.  Nor did Black Diamond send any invoices with CIT Group's stamped notification of assignment and instructions to pay the **Amendment Amounts** into the Wachovia Bank Account.[31]  [Doc. 117, Ex. 3, Franklin Dep. at 35:6-23; Ex. 2, Sergent Dep. at 161:7-165:9; Ex. 12, Hegger Dep. at 45:18-48:11].

The relief requested in CIT Group's Fifth Claim for Relief alleging violation of security interest and lien may not be granted as a matter of law.  CIT Group cannot prevail under the Fifth Claim for Relief and judgment for Commodities is proper.[32]

Constellation Has No Liability for the Claims for Relief Asserted by CIT Group

In the **Second Amended Complaint** CIT Group acknowledges Constellation did not guarantee payment of the **Invoices**.  [Doc. 93 at ¶ 31].  The **Second Amended Complaint** also acknowledges Constellation "is not liable as a guarantor for the amounts due pursuant to the

---

[31]     The record contains no invoices issued by Black Diamond to Constellation reflecting the **Amendment Amounts** as suggested by CIT Group.  [Doc. 153 at 44 n.31].  The **Amendment Amounts** "invoices" are documents prepared by Commodities, not Black Diamond.  [Doc. 156, Second Hoskins Aff. at ¶¶ 32, 33; Doc 119, Ex. 39; Doc. 158, Ex. 5, 6].  These documents contain no notice from Black Diamond indicating the account to send payment for the benefit of CIT Group, as included on each factored **Invoice**.  Further, there is no evidence demonstrating these "invoices" were ever sent to Black Diamond or CIT Group.

[32]     To the extent CIT Group seeks repayment of the **Amendment Amounts** pursuant to the First Claim for Relief or the Second Claim for Relief, CIT Group cannot prevail under those claims because CIT Group has no right to payment of any of the **Amendment Amounts**.

[**Invoices**]." The Guaranty Agreement circumscribed Constellation's obligations to those arising under the **May 2006 Coal Supply Agreement**.[33] [Doc. 117, Ex. 18 at CIT 0001].

Only the First Claim for Relief for breach of contract, Second Claim for Relief for money due on account and Fifth Claim for Relief for violation of security interest and lien are alleged against Constellation. Each claim seeks Constellation's guaranty relating to the **Amendment Amounts**. For the reasons stated above and because Commodities is not liable for any amounts due under the **Amendment Amounts**, the **Invoices** or the **Uninvoiced Deliveries**, Constellation is also not liable for any payment to CIT Group.

An order shall enter granting summary judgment in favor of Commodities and Constellation and against CIT Group and denying summary judgment to CIT Group.

Copies to:

John P. Amato, Esq.
Robert J. Brown, Esq.
Frank F. Chuppe, Esq.
Anthony Ellis, Esq.
Rosanne Thomas Matzat, Esq.
Melvin A. Brosterman, Esq.
Elizabeth H. Cronise, Esq.
Mark N. Rae, Esq.
Claude G. Szyfer, Esq.
Elizabeth Thompson

---

[33] The **Guaranty Agreement** states:
Guaranty. [Constellation] hereby unconditionally and absolutely guarantees the punctual payment when-due of [Commodities'] payment obligations arising under the [**May 2006 Coal Supply Agreement**], including, without limitation, any Termination Payment (as defined in the [**May 2006 Coal Supply Agreement**]) pursuant to Section 12(b) of the [**May 2006 Coal Supply Agreement**], as such [**May 2006 Coal Supply Agreement**] may be amended or modified from time to time, (collectively, the "Guaranteed Obligations"); provided, however, that the total liability of Guarantor hereunder, regardless of any amendment or modification to the [**May 2006 Coal Supply Agreement**], is limited to the lesser of (a) all amounts owed by [Commodities] to [Black Diamond] under such [**May 2006 Coal Supply Agreement**] or (b) the dollar amount specified in Exhibit A hereto as of the date of the event or circumstance that gives rise to a claim by [Black Diamond] under the [**May 2006 Coal Supply Agreement**] for which [Black Diamond] seeks payment hereunder ("Liability Cap"). [Constellation's] obligations and liability under this Guaranty shall be limited to payment obligations only and [Constellation] shall have no obligation to perform under the [**May 2006 Coal Supply Agreement**], including, without limitation, to sell, deliver, purchase, receive, supply or transport coal or any other commodity. [Doc. 117, Ex. 18 at CIT 0001].

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
*The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.*



**Signed By:**
*Joe Lee*
**Bankruptcy Judge**
**Dated: Tuesday, December 13, 2011**
**(jl)**