**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**PIKEVILLE**

IN RE:

BLACK DIAMOND MINING COMPANY, LLC                                CASE NO. 08-70066


THE CIT GROUP/COMMERCIAL SERVICES, INC.                          PLAINTIFF

v.                                                                ADV. NO. 08-7017

CONSTELLATION ENERGY COMMODITIES GROUP, INC.                     DEFENDANTS
CONSTELLATION ENERGY GROUP, INC.


## OPINION

   This matter is back before this Court on remand from the District Court, which affirmed in part, reversed in part, and issued a limited remand in part.  Plaintiff, The CIT Group ("CIT"), was Black Diamond's factor.  Black Diamond sold coal to Constellation Energy Commodities Group ("Commodities"), and CIT purchased Black Diamond's accounts receivable generated by coal sales, including sales to Commodities, in exchange for financing.  Black Diamond went into bankruptcy five years ago.  Commodities never paid CIT for a little under $10 million of its coal purchases from Black Diamond.  CIT wants that money, and brought an adversary proceeding against Commodities to get it.  This Court held that under the agreements between Commodities and Black Diamond (the Coal Supply Agreements, or "CSAs"), Commodities could offset the debts owed to CIT, both with liquidated damages owed by Black Diamond to Commodities, and with termination payments occasioned by Black Diamond's bankruptcy (an event of default under the agreements) and the termination of the agreements that followed.

   Before this Court, CIT had argued that Commodities had defaulted under the CSAs prior to Black Diamond's bankruptcy, by failing to pay a month before the bankruptcy for a relatively small group of shipments.  Therefore, it argued, Commodities lacked the right to terminate the CSAs and to collect its termination payments and liquidated damages.  This Court held that that argument failed as a matter of fact; the due date for the relevant group of shipments, we held, was a month later than CIT said it was, and a few days after the bankruptcy.  CIT appealed, arguing that the evidence on which we had relied to make that finding was hearsay, that we had failed to address that contention, and that we had failed to address other evidence in favor of its preferred due date.  The District Court agreed that our treatment of this issue was lacking, and issued a remand on four issues: whether the evidence on which we had relied was hearsay, whether there was a genuine issue of material fact concerning the payment date for the shipments, whether, if the due date was as CIT argued, and Commodities breached the CSAs, Black Diamond waived the breach as a matter of

1

New York law, and finally, if Black Diamond did not waive the breach, what effect that had on Commodities' ability to offset with termination payments and liquidated damages.

The Court makes the following findings of fact and conclusions of law. On the hearsay issue, all of the evidence that we admitted is admissible, though some of it is not admissible for its truth. As to whether there is a genuine issue of material fact on the due date, a genuine issue of material fact remains, and would remain even if the disputed evidence was fully admissible. The evidence on both sides is weak, and is in equipoise. However, there will be no need for a trial in this case. Assuming that the due date is when CIT said it was, Commodities did not breach the CSAs. There is, then, no effect, even if CIT is right on the facts, on Commodities' ability to offset CIT's claims with termination payments and liquidated damages. And we need never address, as that question is prior to waiver, whether Black Diamond waived the breach, or the welter of arguments the parties make as to the CSAs' provisions for damages. The Court grants Commodities summary judgment on the issue of breach, and allows it to recoup its termination payments and liquidated damages as before.

**Factual and Procedural Background**

The facts underlying this adversary proceeding have been recounted exhaustively, both in this court's opinion, Bankr. Ct. Op. 2-26 and the District Court's opinion, Dist. Ct. Op. 1-12. The following statement of facts, therefore, is brief and relates only to those matters before the Court on remand.

In May 2006, Black Diamond, the debtor in the underlying bankruptcy case, and Commodities, the defendant in this adversary proceeding, entered into a coal supply agreement, the May 2006 Coal Supply Agreement. Doc. 117-4, Ex. 9. Under that agreement, Black Diamond made monthly shipments of coal to Commodities at fixed prices. *Id.* at 2. Critically to this case, the May 2006 Coal Supply Agreement provided that in the event of an Event of Default, the non-defaulting party had the option to either suspend performance until the default was cured (but could suspend performance for no longer than sixty days), or could terminate the agreement. *Id.* at 15. If the non-defaulting party chose to terminate, a termination payment would be calculated. *Id.* That payment would not necessarily go to the non-defaulting party; it would be paid to whichever party stood to lose more from the termination of the agreement, in the amount of the losses that that party would incur as a result of the termination of the agreement. *Id.* The agreement also contained a provision, referred to by this Court in its opinion as the Netting and Set-off Provision, under which the parties agreed to set off mutual debts owed under the agreement, or critically, any other transaction between the parties in coal. *Id.* at 17. Black Diamond and Commodities subsequently entered into several more coal supply agreements ("CSAs"), all with virtually identical terms to the first agreement in all key respects.

At about the same time that it entered into the May 2006 Coal Supply Agreement, Black Diamond entered into a factoring agreement (the "Factoring Agreement") with the plaintiff in this adversary proceeding, CIT. Doc. 117-4, Ex. 13. Under that agreement, Black Diamond sold its

2

accounts receivable generated by coal sales to CIT in exchange for the receiveables' face value, less a small percentage. *Id.* at 1, 3, 7-8. As to those accounts receivable covered by the Factoring Agreement, Black Diamond agreed to put a notice on each invoice instructing its customers to pay CIT and only CIT. *Id.* at 2. Black Diamond complied with that condition; indeed, the invoices at issue in this adversary proceeding were made payable to CIT. Doc. 119-10 at 32-33.

Between December 16, 2007 and February 5, 2008, Black Diamond made numerous shipments of coal to Commodities, in the amount of a little under $10 million, for which Commodities never paid CIT. *See* Bankr. Ct. Op. at 14-16. The district court found that, pursuant to the CSA's, the invoices for Black Diamond's shipments were generally payable in sixty days. *See* Dist. Ct. Op. at 25. That payment term very nearly sounded (and still may sound) the death knell for CIT's hopes of getting paid, for the following reasons. Multiple creditors, including CIT itself, filed an involuntary petition against Black Diamond on February 19, 2008. Thanks to the sixty-day payment term, payment for the December 2007 and January and February 2008 invoices was generally due after that date. The involuntary petition against Black Diamond was an event of default under the CSAs. Doc. 117-4, Ex. 9 at 13. That event of default gave Commodities the right to terminate the CSAs–a right of which Commodities immediately availed itself, triggering termination payments which, as events would have it, rebounded to Commodities' credit in amounts well in excess of the unpaid invoices. Doc. 117-8, Ex. 47 at CIT0890-92. Moreover, under the Netting and Set-Off Provision, Commodities was able to offset the deliveries for which it had not paid with a number of scheduled deliveries on which Black Diamond had failed to deliver.

For Commodities, there was just one problem–a set of seven unpaid invoices, delivered to Commodities on December 22 and worth a little over $400,000, that CIT claimed were sold on a thirty-day payment schedule. CIT argued to this Court, in support of its contract claims, that payment on these shipments was due on January 21, 2008, nearly a month before Black Diamond's bankruptcy; that Commodities' failure to pay for these shipments was an event of default that preceded Black Diamond's bankruptcy and prevented Commodities, itself a defaulting party, from declaring an event of default and terminating the CSA's; that Commodities' default likewise prevented Commodities from recouping debts owed to it under the Netting and Set-Off Provision. Using this camel's nose in the tent strategy, CIT hoped to use Commodities' lateness in paying for the $400,000 worth of December 22 shipments as grounds to get the $9.6 million it was owed on all the other shipments, free of off-set from undelivered shipments or termination payments.

This Court rejected the factual premise of CIT's argument, finding largely on the basis of an email exchange between Black Diamond's CFO and a Commodities rail scheduler that the December 22 invoices did not come due until February 22, three days after the involuntary petition was filed against Black Diamond. *See* Bankr. Ct. Op. at 49-50. CIT, however, had argued to this court that the email exchange was hearsay. *See* Dist. Ct. Op. at 25. We did not address that contention, nor did we address any of the evidence pointing to the January 21 date, including the invoices themselves, which gave that date. CIT appealed to the District Court, and the District Court remanded on whether the email exchange was hearsay, and on a series of issues cascading

3

from that question. Namely, we are to decide whether or not the email exchange between Black Diamond and Commodities is hearsay, whether there is a genuine issue of material fact as to the payment date for the December 22 shipments; whether, if the due date was January 21, and we determine that Commodities breached the CSAs, Black Diamond waived the breach as a matter of New York contract law; and what effect, if the due date was January 21 and Black Diamond did not waive the breach, that breach had on Commodities' ability to offset the amounts owed CIT with termination payments and amounts owed Commodities for undelivered shipments. *See* Dist. Ct. Op. at 26-27.

## Hearsay

Before taking up the parties' arguments on the hearsay question, it will help to provide a brief account of the emails at issue. On February 5, David Hegger, Black Diamond's CFO, asked Bridget Shaffer, a Commodities rail scheduler who processed payments, when Commodities would pay for certain shipments. Doc. 119-9 at 27, Ex. 17. Ms. Shaffer replied the next day, "[w]e'll be paying the November invoices tomorrow and the December invoices on 2/22/08, thanks." *Id.* Mr. Hegger immediately forwarded Ms. Shaffer's response to Jeff Lew of CIT. Mr. Lew replied, in part, "[t]he river invoices billed in November on N60 [a sixty-day payment schedule] will be paid tomorrow 2/7/08? The December river invoices were billed on N30 [a thirty-day payment schedule], but will be paid on 2/22/08 because the original terms should have been N60?" Doc. 163-2 at 79, Ex. 15. Mr. Hegger simply replied "yes." *Id.* Finally, Mr. Hegger replied to Ms. Shaffer two days later and inquired after the status of the payment for the November invoices, but did not challenge her on, or mention, the February 22 payment date. Doc. 119-9 at 27, Ex. 17.

Commodities' first salvo in this admissibility dispute is that the entire Shaffer-Hegger email exchange is not hearsay because Ms. Shaffer's statement is not being offered for its truth, but for its effect on that statement's listener, Mr. Hegger. Commodities is not, it assures us, offering Ms. Shaffer's statement to show that payment was due on February 22 because that was when Ms. Shaffer said Commodities would pay, but rather, to show that Black Diamond "did not express a contrary understanding." Defendant's Opening Br. at 8.

Initially this argument fails, or at least is in want of something to prop it up. It is, of course, hornbook law that a statement is not hearsay if offered for its effect on the listener rather than its truth, and so Commodities' argument does take care of Ms. Shaffer's note. But the issue before the Court on remand is whether the entire Shaffer-Hegger exchange is admissible, not whether Ms. Shaffer's note is admissible on the premise that Mr. Hegger's is, and nothing in this argument explains why Mr. Hegger's seeming acquiescence in Ms. Shaffer's advisement of the February 22 payment is admissible. Mr. Hegger's reaction is not offered for an effect on *its* listener, but rather is offered for the truth that it at least implies, i.e. that Black Diamond knew payment was due on February 22 and not sooner. And if the effect that Ms. Shaffer's statement had on its listener, Mr. Hegger, is itself inadmissible hearsay, then Ms. Shaffer's statement cannot be admitted as context for that effect. Mr. Hegger's failure to object is admissible for reasons given below, but obviously if Mr. Hegger had been more explicit and replied to Ms. Shaffer, "how right you are!", Mr. Hegger's

4

statement would be inadmissible and Ms. Shaffer's statement could not be admitted to show what Mr. Hegger was responding to.

Mr. Hegger, however, did not say "how right you are!"; he said nothing (at least to Ms. Shaffer), and that makes all the difference. One of the many sparks that Commodities throws off in its shotgun briefing of this issue is that the statements here may be implied assertions, that is, statements offered to show the declarant's belief in a fact the truth of which the declarant did not intend to assert.[1] *See United States v. Zenni*, 492 F. Supp. 464, 466 (E.D. Ky. 1980) (defining an implied assertion as an "utterance[] not offered for the truth of the words," but "[r]ather . . . offered to show the declarant's belief in a fact sought to be proved"). Commodities is not clear on whether the implied assertion it is talking about is Ms. Shaffer's or Mr. Hegger's or both; CIT, taking Commodities to mean the former, persuasively argues that Ms. Shaffer's note was not merely an implied assertion that payment was due on February 22, but rather was an intended assertion to the extent it was an implied one.[2]

But the implied assertion argument fares better in Mr. Hegger's case; although he arguably manifested his understanding that Ms. Shaffer's proposed payment was not delinquent by not questioning her about it, he did not intend to assert by his silence that it was so. *See, e.g.*, *Wilson v. Clancy*, 747 F. Supp. 1154, 1158 (D. Md. 1990) (holding that "silence, at least where there is no showing of intentional silence on a particular occasion intended as an assertion when the silence was kept, is no longer within the hearsay realm," but rather is treated as an admissible implied assertion). Of course, Mr. Hegger's silence may have very little evidentiary weight; it is ambiguous, and the fact that Mr. Hegger asked Ms. Shaffer on February 5 when Commodities would pay for the December 22 invoices creates real doubt as to whether he knew all along that payment wasn't due yet. Indeed, the court in *Wilson*, after holding that non-assertive silences were non-hearsay, excluded the silence at issue in that case from the jury's purview on the ground that "the probative value of silence, unless under circumstances that compel speech, is so weak and so fraught with speculation as to its reason that it is far outweighed by the prejudicial effect of introducing such evidence." *Id.* at 1159. But as this is not a jury trial and prejudice is less of a concern, this Court admits Mr. Hegger's silence, as an implied assertion, for what it is worth, and admits Ms. Shaffer's statement about payment as the necessary non-hearsay context to that silence.

---

[1] For example, when one person approaches another on a street and says that he would like to buy cocaine, he manifests his belief that the other has cocaine to sell without intending to assert that that is the case.

[2] The point is arguable; it is theoretically possible that Ms. Shaffer could assert her intent to pay February 22, thereby manifest her belief that payment was due on February 22, but not intend to assert or imply that payment was due on February 22. To the Court, however, assertion seems very difficult to remove or separate from belief in this context. When one intends to pay when payment is due, and says that one will pay on the date one thinks payment is due, there is likely always a pregnant "when payment is due" in such statements. For example, suppose one impatiently asks one's boss when one's paycheck will arrive. When the boss replies, "you will be paid next Friday," there is obviously an implicit "when you are supposed to be paid" in that statement–and not simply as a manifested belief, but as an intended assertion. So, if Commodities seeks to admit Ms. Shaffer's email as evidence of her belief that payment was due February 22, it is inadmissible because, to the extent it is evidence of that belief, it is also an intended assertion that payment was due February 22.

5

Another way in which the Shaffer-Hegger email exchange is admissible as nonhearsay in the strict sense (as opposed to nonhearsay as adoptive admission) is to show its effect on Mr. Lew of CIT. Commodities makes a variant of this argument, suggesting that the content of the exchange is admissible because Mr. Lew adoptively admitted to it–a claim which the Court deems overambitious, but which can be fairly read to include the lesser argument that the exchange is admissible for its effect on Mr. Lew. Mr. Lew, recall, when told that Commodities would pay on February 22, asked whether that was so because the invoices were mistakenly billed on a thirty-day payment schedule instead of the usual sixty. Mr. Hegger answered Mr. Lew's email–which to be sure contained one other question–with a simple "yes," at which point Mr. Lew dropped the matter. Whatever Mr. Hegger's "yes" meant, Mr. Lew's silence in its face, and the question he asked, suggest at least that he did not object to Ms. Shaffer's proposal to pay on February 22, and that he thought it at least possible that payment was due on that date and not before. Mr. Lew's silence, like Mr. Hegger's silence before it, is an admissible implied assertion, and the chain of emails forwarded to him may come in not for their truth, but for the admissible effect they had on Mr. Lew.

Whether Mr. Lew's question is hearsay is a more complicated question. It isn't in the view of the Court, but only because it is a statement by a party-opponent, not because it is a question. Courts, the Sixth Circuit included, are fond of saying that questions are not assertions by definition; they inquire what is the case, rather than stating what the case is. *See, e.g.*, *U.S. v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003) ("[A] question is typically not hearsay because it does not assert the truth or falsity of a fact. A question merely seeks answers and usually has no factual content."). However right that may be as a general principle, this case confutes that commonplace because Commodities is offering Mr. Lew's question to show that Mr. Lew believed the term on the invoices might be a mistake–*which is something his question asserted*. When one asks whether something is or is not so, one is usually asserting one's desire to know whether that thing is or is not the case, and therefore asserting one's belief that it may be the case. And though this isn't so of all questions (some questions are rhetorical or disingenuous), we have no reason to doubt it was the case of Mr. Lew's question; Mr. Lew was rather plainly asserting a belief that the date on the invoice might have been in error and that the invoice might have been payable in sixty days. That said, Mr. Lew's question is not hearsay, not because it is non-assertive, but because it is a statement by a party-opponent, CIT, that the invoice might have been payable in sixty days. *See* Fed. R. Evid. 801(d)(2) (defining as non-hearsay statements made by an opposing party "in an individual or representative capacity," or "made by a person whom the party authorized to make a statement on the subject").

In sum, then, the Shaffer email is admissible for its effect on Mr. Hegger, which in turn is admissible because his silence was an implied assertion. And the entire exchange is admissible for its effect on Mr. Lew, which is admissible because his silence was an implied assertion and his question was a statement by a party-opponent that CIT thought Ms. Shaffer might be right about the payment date. Of course, admitting the exchange on this theory fails to let Ms. Shaffer's note in for what Commodities claims it asserts–that payment was due on February 22. Commodities, naturally, would like to get it in not just for its effect on others, but for its own content, and makes a number of arguments that it can be so admitted, which the Court takes up in turn.

6

Commodities' first effort to admit Ms. Shaffer's statement for its truth is by way of the adoptive admissions rule. Commodities argues that the statement was adoptively admitted both by Black Diamond and by CIT. Both of these arguments have the difficulty of relying on silence as a manifestation of a belief that Ms. Shaffer's statement was true. Commodities helpfully points to an advisory committee note to Rule 801 that says silence can be an adoptive admission of a statement's truth if "the person would, under the circumstances, protest the statement made in his presence, if untrue." Fed. R. Evid. 801 advisory committee's note. Unfortunately for Commodities, that note only shows why its adoptive admission theory cannot work, at least with respect to Black Diamond. First, it's not obvious that Black Diamond would protest an inaccurate statement about when payment was due, as it was not the party being paid. Black Diamond was just asking on CIT's behalf, and passing the information it received along. Second, the argument assumes that Ms. Shaffer's statement about when Commodities would pay was in fact a statement about when Commodities was supposed to pay, and that Mr. Hegger understood it as such. Ms. Shaffer, after all, announced her intentions to pay the November invoices late in the very same email. Mr. Hegger could have thought that Ms. Shaffer was saying that Commodities would pay the December invoices late too, in which case his silence would not have been an admission about the due date. The only truth in which Mr. Hegger could manifest a belief, if he read the statement that way, is that Commodities would pay on February 22. For these reasons, the Court need not address the thorny question, heatedly disputed by CIT, of whether Black Diamond can somehow make an adoptive admission that binds CIT after having sold its interest in the account receivables to CIT.

Commodities also argues that the Shaffer-Hegger exchange is binding on CIT as an admission. The argument goes that Mr. Lew's silence in response to Mr. Hegger's "yes" after Mr. Lew asked whether the invoice's "terms should have been N60" is an admission. CIT makes a great deal of the fact that Mr. Hegger's "yes" was ambiguous because it was a response to not one question about the December invoices, but two questions including the question on the December invoices. Therefore, it argues, even if Mr. Lew's silence did manifest a belief in the truth of that "yes," we don't know in what Mr. Lew was manifesting a belief. Commodities reasonably responds that we should take Mr. Hegger's "yes" as an affirmative answer to both questions, but whoever gets the better of that dispute, the bigger problem with the argument is that it's very difficult to see how silence can be a manifestation of one's belief that the answer to a question one just asked is correct. Mr. Lew asked whether the invoice should have been billed on sixty-day terms; that suggests he was open to the possibility, but it also suggests he did not affirmatively believe it to be so. When he was told that the answer was yes and did not object, how could he thereby manifest a belief that Mr. Hegger was right? Commodities says that had he disagreed he would have objected, and that he therefore believed what Mr. Hegger said was true, but the whole point of asking the question was that he didn't know the answer. All the silence shows is what the act of asking the question in the first place shows–that he had no positive view on the subject either way.

However, the argument can be saved, because the very act of asking the question manifests a belief in whatever answer Mr. Hegger would give. That is to say, Mr. Lew in essence asserted that he did not know when the invoice should have been billed, but that he believed Mr. Hegger did

7

know, and that he would believe whatever Mr. Hegger would tell him.  Had Mr. Hegger said that Commodities was paying on February 22 because it was late, he presumably would have believed that; had Mr. Hegger said that Commodities was paying on time and that the invoice date was wrong, he presumably would have believed that too.  The subsequent silence is besides the point; what matters is that Mr. Lew asked the question.  The difficulty then becomes what statements Mr. Lew adoptively admitted.  Mr. Hegger's "yes" comes in as an adoptive admission; what that answer meant is a question of its evidentiary value, not of its admissibility.  CIT cites cases that it claims say that ambiguous answers to compound questions are inadmissible, but one of the cases, *Cybiotronics, Ltd. v. Golden Source Electronics Ltd.*, 130 F. Supp. 2d 1152, 1169 (C.D. Cal. 2001), just says that such answers have little evidentiary weight, and the other, an unpublished case from the Ninth Circuit, merely held that a district court's exclusion of an answer to a compound question was not an abuse of discretion.  *See Paramount Farms Int'l LLC v. Ventilex B.V.*, No. 11-15518, 2012 WL 6053179 (9th Cir. Nov. 21, 2012).

But what the Court does not see is that Mr. Lew somehow adoptively admitted the truth of what Ms. Shaffer said.  Rather than acquiesce in her email once it was forwarded to him, he sought confirmation from Mr. Hegger that Commodities was paying on February 22 because that was when payment was due.  The fact that he asked shows that he either did not trust Ms. Shaffer, or more probably that he did not understand her to be making a claim about when payment was due–that, rather, he only understood her to be stating when Commodities would make payment and wanted to know what the reason for that date was.  Either way, he did not manifest a belief that what she said was true, if what she was saying was indeed that payment was due on February 22.

That train of logic still leaves Ms. Shaffer's statement out on the cold, at least when offered for its own truth.  So Commodities' next and best shot at admitting Ms. Shaffer's statement for that purpose is the business records exception.  CIT makes a great many spurious arguments about why Ms. Shaffer's email is not a business record, even contending that it wasn't made in the course of a regularly conducted activity of Commodities' business because contradicting acknowledged payment terms on invoices surely could not have been a regularly conducted activity at Commodities.  But one of CIT's arguments is well-taken and correct.

Business records, of course, must be contemporaneous; in the language of the rule, a "record of an act" is admissible if "the record was *made at or near the time* by . . . someone with knowledge.  Fed. R. Evid. 803(6) (emphasis added).  The rule requires contemporaneousness for the purpose of reliability; uncontemporaneous records can be inaccurate on account of fading memories.  *See* McCormick on Evidence § 289; Hearsay Handbook § 16.7.  Commodities claims that two months, from December to February, is contemporaneous enough to the shipment and whatever Ms. Shaffer was then told about the payment term.  The Court does not think two months is close enough, for the following reasons.

As we have seen, Commodities processed a large number of shipments, and when it bought from Black Diamond it almost invariably did so on a sixty-day payment schedule.  Indeed, the December 22 shipments are the only shipments we know of that might not have conformed to that

8

term. Under these circumstances, the chance of Ms. Shaffer's forgetting, two months later, whatever she was told about the December 22 shipment (assuming she was told anything beyond what the invoices said), and assuming that they were payable within the usual sixty days, seems very high. As Commodities has not come forward with some record on which Ms. Shaffer relied when she said the date was February 22, and since the invoices state the contrary, we can only assume that her understanding, if based on anything but an assumption that the normal payment term applied, was based on some oral representation at the time of the purchase that the payment term was the usual sixty days. The Court cannot conclude that Ms. Shaffer's memory of what was said to her two months prior about a single shipment is fresh enough or reliable enough to satisfy the contemporaneousness requirement or its purposes, nor can it ignore the very real chance that Ms. Shaffer simply forgot that this shipment had been billed on a thirty-day term and assumed it was billed on the regular sixty.

Commodities cites two cases to show that two months are not too long. The first, *Selig v. United States*, 740 F.2d 572 (7th Cir. 1984), involved appraisals of what a baseball team's roster was worth in April that were made in November. Whatever the infirmities of uncontemporaneous appraisals are, and the Court must confess to not understanding what they could be when the thing being appraised is a roster of baseball players with recorded and dated statistics, they do not include the risk of memory lapse. And as one treatise has noted, *Selig* "represents about the outer limit of contemporaneousness for purposes of this exception to the hearsay rule." Hearsay Handbook § 16.7. It is telling that Commodities' very first cite is a case known for its uniquely expansive reading of the contemporaneousness requirement. Commodities' second case, *Condus v. Howard Savings Bank*, 986 F. Supp. 914 (D.N.J. 1997), involves outside reports on a bank's lending process. The reports were completed two months after the auditors began their investigation. *Id.* at 918. Here too, there was no risk of memory lapse; auditors don't typically do an audit and then create a report two months later from memory. Rather, as the case's facts show, the creation of the report was an ongoing process and its initial drafts were created less than a month after the auditors began their investigation. *Id.* The cases Commodities cites, then, do not help its position at all. On the other hand, there are numerous cases holding that intervals of about this length render a record uncontemporaneous. *See, e.g.*, *Wilco Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618, 628 (1st Cir. 1988) (three months exceeded the contemporaneousness requirement); *State v. Dickens*, 926 P.2d 468, 486 (Ariz. 1996) (two months exceeded the contemporaneousness requirement).

Before turning to Commodities' final argument for admitting the Shaffer email, the Court also notes that there are trustworthiness concerns here, independent from the email's lack of contemporaneousness. (CIT raises trustworthiness as an issue, but has little to say about it.) The business records exception, in addition to all its specific requirements, requires that "neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6). This requirement is most often invoked to exclude records made in the expectation of litigation. But it may have application here too. Ms. Shaffer's email was not an internal record of when payment was due; it was, to the extent it can be read as a statement about when payment was due at all, a statement about the due date to the vendor, Black Diamond,

9

made in the context of an inquiry about what Black Diamond thought was a late payment. Business records are deemed reliable because businesses have no reason to lie to themselves, but this record is really a statement made to another. In the ordinary course, there would be no point in lying to a vendor about when payment was due; the vendor would know. But this isn't the ordinary case, or we wouldn't be deciding this issue; this transaction was oral and as the foregoing discussion has shown, the parties were quite confused about when payment was due, so Ms. Shaffer might well have seen the benefit of suggesting that payment was due later than it was. She certainly had little incentive, supposing the date really were January 22, to tell the truth. The Court in no way means to suggest there is a very good chance that Ms. Shaffer was lying about the due date, but merely that the email does not rise to the level of trustworthiness that justifies the exception.

Finally, Commodities argues that if the exchange is not admitted under the business records exception, it should be admitted under the residual exception in Rule 807, which allows hearsay to be admitted if it has "equivalent circumstantial guarantees of trustworthiness" to hearsay covered by the specific exceptions in Rule 803. Fed. R. Evid. 807. The problem with this argument is that the residual exception was put in the Rules for evidence that is not covered by the technical requirements of the exceptions, e.g. records that are not business records, not evidence that fits under the technical requirements of the exceptions but can't be admitted for a core reliability-based reason, like contemporaneousness. A business record that cannot be admitted because it is not contemporaneous and therefore not reliable does not have "equivalent circumstantial guarantees of trustworthiness" to a business record that is contemporaneous. Commodities, in arguing in the alternative that the exchange can be admitted through the residual exception, obviously did not have the benefit of knowing on what ground the Court might hold that the exchange isn't an admissible business record; Commodities seems to posit a ruling that the emails are not business records in a more technical sense, e.g. that they lack a foundation or were not kept in the course of a business's regularly conducted activity. Indeed, all of the cases that Commodities cites in which records that weren't quite business records were admitted under the residual exception involved records that didn't cut it as business records for those reasons. None failed the business records exception for lack of contemporaneousness.

To sum up, then, the Shaffer email is admissible as nonhearsay for its effect on Mr. Hegger, and Mr. Hegger's silence in response to the Shaffer email is admissible as an implied (that is, unintended) assertion. Both Ms. Shaffer's and Mr. Hegger's statements are admissible for their effect on Mr. Lew–that effect being the question he asked Mr. Hegger in response to them, and his silence in response to the answer Mr. Hegger gave. Mr. Lew's question is admissible as an admission of a party-opponent that he was not sure when the due date was, and the silence is admissible as an implied assertion. Ms. Shaffer's statement is not admissible for its truth as an adoptive admission on the part of Mr. Hegger, because his silence did not necessarily manifest a belief in its truth and because it's unclear what truth he would have taken Ms. Shaffer to be asserting. Mr. Hegger's "yes" is admissible as an adoptive admission on the part of Mr. Lew, because the question Mr. Lew posed to Mr. Hegger manifested a belief in whatever answer he was given. But Ms. Shaffer's statement is not admissible as an adoptive admission on Mr. Lew's part because Mr. Lew never manifested a

10

belief in its truth. Ms. Shaffer's statement, finally, is not admissible as a business record because it is not contemporaneous to the event it records and possibly not trustworthy, nor, for these reasons, can it be admitted under the residual exception as containing "equivalent circumstantial guarantees of trustworthiness" to a business record.

### A Genuine Issue of Material Fact?

Sad to say, the parties put us through our paces on the hearsay rule for naught. Even if the entire email exchange were admissible for its truth, there would still be a genuine issue of material fact on when payment was due; even were it all excluded, there would still likely be a genuine issue of material fact. The reason the question of the due date cannot be resolved on summary judgment is simple. The December 22 delivery was subject only to an oral agreement. Strangely, we have no affidavits from the parties to that agreement. All we have are statements from, and evidence produced by, third parties, like Ms. Shaffer and Mr. Hegger. And as the District Court ably illustrated in its list of the pieces of evidence of the due date, the evidence is in equipoise. *See* Dist. Ct. Op. at 24-25. On the one hand, the invoices themselves listed a January due date, and Ms. Shaffer, in January, confirmed receipt of those invoices without objecting to their terms. And a March email from a Black Diamond employee says the date was in January as well. On the other hand, Ms. Shaffer's statement, if admitted for its truth, suggests that by February she thought the due date was later, and Mr. Hegger's statements and conduct suggest the same, though they too are ambiguous. Finally, we have an affidavit from a rail scheduler at Commodities who says that all the oral agreements between Commodities and Black Diamond were billed on sixty-day terms. Given this evidentiary mess, the uncertainty over where people like Ms. Shaffer and Mr. Hegger came by their information, and the lack of any evidence from the people who actually negotiated the agreement, it is impossible to decide the issue without credibility determinations and without examination that would help evaluate the meaning of the many deeply ambiguous statements on which the parties want us to rely to decide this issue.

We begin with a summary of the evidence in CIT's favor. There are, first, the invoices. They said that payment was due on January 21. Doc. 119-8 at 1, Ex. 15. Even if the invoices were all CIT had, Commodities would have to make a much stronger showing than it has for us to decide that the date on the invoices was mistaken and to rule for Commodities on summary judgment. But CIT has more. On January 11, Donna Lewis of CIT's Audit Department asked Ms. Shaffer to confirm that it had received certain invoices, including the December 22 invoices. Doc. 119-10 at 30, Ex. 22. She asked her to "[p]lease make any notations if you had any problems with the billing, mdes, shipping, terms, etc." *Id.* She attached a spreadsheet with invoice numbers, invoice dates, amounts, and *due dates*. *Id.* at 29-30. Next to the due date field on the spreadsheet, there was a comments field. For the December 22 invoices, the spreadsheet listed a due date of "12108." Ms. Shaffer wrote the word "yes" in the comments field for each December 22 invoice, next to the "12108" listed for each invoice. *Id.* at 30.

Commodities argues that all these "yeses" mean is that Ms. Shaffer had received the invoices. Technically, Commodities is correct. Ms. Shaffer was asked whether she had received the

11

invoices and she said she had. Next to invoices that she had not received, she wrote "we don't have." *Id.* So the meaning of the "yes" is clear in context. Nevertheless, Ms. Shaffer was also asked to make notations if she had problems with the invoices' terms. And even if she did not conduct an invoice-by-invoice review, the due dates were inescapable; they were next to the blanks in which Ms. Shaffer repeatedly confirmed her receipt of the invoices. And it also would have been obvious that the invoices were billed on atypical thirty-day terms, for next to the due dates were the shipment dates. Yet Ms. Shaffer did not object. Her failure to do so has some meaning, and undermines the weight of her later statement on the matter, a statement that was made after the January 21 date had passed.

Then there is Ms. Shaffer's curious response, after her February 6 email to the effect that Commodities would pay on February 22, to subsequent emails from CIT seeking payment. On February 4, February 8, and February 15, CIT emailed Ms. Shaffer to say that payment was past due on the December 22 invoices. *Id.* at 34. Ms. Shaffer did not say that payment was due on February 22, not January 21; she said nothing. Finally, in response to the February 15 email, she wrote "thank you!" that same day, and said nothing more. *Id.* Why would she do this if it were her belief that payment was really due on February 22, as Commodities would have us think? This string of unresponded-to collection emails, followed by a non-responsive "thank you!" greatly buttresses CIT's argument that all Ms. Shaffer was saying on February 6 is that Commodities planned to pay a month late, not that payment had always been due on February 22.

Finally in CIT's favor there is an email from one Joe Funk of Black Diamond, written in March, after Black Diamond's bankruptcy, stating that Commodities "was N60 until the last week of December. <u>I have found no documentation to support</u>, but our people suspect this was an agreement that was worked out with Constellation to improve our cash flow." Doc. 171 Ex. 60 (emphasis in original). This email does not help CIT much; what "our people" suspected is hearsay, besides which, those people's suspicions are contradicted by the facts; after the December 22 invoices, Black Diamond made a series of shipments on the usual sixty-day terms. But it is another small piece of evidence in CIT's favor.

That all said, none of what CIT has is conclusive. CIT's evidence is essentially that the anonymous preparer of the December 22 invoices believed that the payment term of the oral agreement between Commodities and Black Diamond was thirty-day payment, and that Ms. Shaffer, a payment scheduler at Commodities, acted on multiple occasions as if she believed that term was correct, both by not objecting to the invoices when she was asked to say if she had problems with their terms, and by not objecting (or saying anything) when CIT told her the invoices were past due. (It also has Mr. Funk's email, but that has little weight.) How much is all that worth? Ms. Shaffer was not a party to the oral agreement; the fact that she acted as if the invoices were correct may only show that she took them at their face value, not that she had some knowledge independent from the invoices about the agreement's terms. And the invoices could, after all, be inaccurate; the invoice date could even have been a typographic error. Without Ms. Shaffer's testimony we will never know what she really thought or why she thought it. Without some evidence about how the invoices were

12

created we will never know how they came to incorporate a thirty-day payment term that differed from every other transaction between Commodities and Black Diamond.

Then there is Commodities' evidence. It is even less conclusive. First, there is the affidavit from Philip Hoskins, a rail scheduler at Commodities for coal trains. Doc. 156. He scheduled the rail cars that delivered coal from Black Diamond to Commodities. *Id.* at ¶ 1. Mr. Hoskins helpfully explains that the oral agreements between Black Diamond and Commodities were made between Harold Sergent of Black Diamond and either Robert Nelson or Christopher Savage of Commodities. *Id.* at ¶ 9. These oral agreements, he says, were pursuant to the non-commercial terms of the CSAs, included among which were the sixty-day payment terms for invoices. *Id.* at ¶¶ 7-8. But Mr. Hoskins has nothing to say about whether this particular oral agreement was subject to the normal sixty-day term. We know, of course, without the help of Mr. Hoskins's affidavit that the oral agreements were generally pursuant to that term, because the December 22 invoices seem to be the only invoices ever billed on thirty days. But Mr. Hoskins's affidavit says nothing about whether that term might have changed when the December 22 agreement was negotiated. He does not attest that anyone told him about the terms of that agreement, and he was not a party to it; all he knows is that the oral agreements generally incorporated the terms of the CSAs. The Court cannot see that this affidavit helps Commodities at all.

Other than the affidavit, and the fact that the CSA's used a sixty-day payment term, all that Commodities has are the emails. If the foregoing discussion on hearsay shows anything, it's that parsing what these emails and the many silences accompanying them meant reveals little certainty. Even if Ms. Shaffer's email were admissible for its ambiguous "truth," it is belied by her confirmation of the invoices and her unresponsiveness to CIT's collections efforts. Moreover, the basis she had for thinking that payment was due in sixty days is completely unclear. If she merely assumed it was because it had always been in the past, her statement is worth nothing.

Then there is Mr. Hegger's silence in response to her email. Of course, that is very ambiguous, but at most it shows that Black Diamond's CFO thought that payment was due on the usual sixty-day term. Mr. Funk of Black Diamond, however, thought differently, as did the nameless Black Diamond employee who prepared the invoice. Most helpfully to Commodities, there is Mr. Hegger's "yes" in response to two questions Mr. Lew asked, only one of which was whether the payment term on the December invoices should have been sixty days. The Court agrees with Commodities that the "yes" is best read as an affirmative response to both questions, but a reasonable factfinder could find the "yes" ambiguous. Hence, it cannot be the foundation on which we grant summary judgment. But even if the "yes" were unambiguous, what is it worth? All it shows is that the Chief Financial Officer of Black Diamond–perhaps not the best qualified person to know the due date of a given invoice–thought payment was due on February 22. He could have thought so because Ms. Shaffer told him so, or because sixty days was the usual term; there is no evidence that Mr. Sergent, the person at Black Diamond who negotiated the agreement, said anything to him about it. And again, others at Black Diamond–Mr. Funk and the drafter of the

13

invoice–thought differently, as it seems did Ms. Shaffer at Commodities and the Audit Department of CIT.

Finally, Commodities absurdly relies on Mr. Lew's *questions* about when payment was due, which it inventively recharacterizes as Mr. Lew's "expressly state[d] . . . understanding" about when payment was due. Defendant's Reply Br. at 12. What actually happened, of course, is that when Mr. Hegger told Mr. Lew that Commodities would not be paying until February 22, Mr. Lew asked whether that was "because the original terms should have been N60." Doc. 163-2 at 79, Ex. 15. Mr. Lew wanted to know why Commodities was paying at a later date than the invoices demanded, and merely suggested the possibility that it was paying late because the invoice was wrong.

In sum, given that we have a fair amount of evidence pointing both ways, and given that none of it, with the exception of the invoices cutting the one way and perhaps Mr. Hegger's views cutting the other, is very compelling, it seems transcendently obvious that a genuine issue of material fact still remains as to when payment was due for the December 22 invoices. Even with credibility determinations and testimony the issue would likely be something of a tossup, but at least testimony would help clarify such lingering questions as the meaning of Ms. Shaffer's and Mr. Hegger's remarks, the source of their information, what if anything Mr. Hoskins knew about this particular shipment, and how the invoice came to say what it did–as well, of course, as how credible any of these people are.

### Whether Commodities' Failure to Pay was a Breach of the CSAs

The next issue before the Court on remand is whether, if the due date were January 21, Commodities' late payment was a breach of the CSAs. The parties, strangely, address waiver first, and brief this question as if it were a part of the last issue before us on remand–namely, if Black Diamond did not waive the breach, what effect does that have on Commodities' ability to recoup. But that misunderstands our scheduling order for briefing on the remand, the District Court's remand, and the law. The third issue on which the parties were to brief us was:

> If the Court determines the payment due date was January 21, 2008, *and the Court determines Commodities breached the May 2006 Coal Supply Agreement,* whether, as a matter of New York law, Black Diamond waived the breach.

Doc. 220 at 2 (emphasis added). And the district court opinion reads on this point:

> Finally, if the due date was January 21, 2008, *and Commodities did breach the 2006 Coal Supply Agreement*, the bankruptcy court should re-assess its decision on the breach of contract and outstanding invoice claims. It will need to determine whether, as a matter of New York law, Black Diamond waived the breach.

Dist. Ct. Op. at 26 (emphasis added). And of course, that is as it should be; breach is logically prior to waiver. So the Court will address the question of breach first.

14

It is common ground between the parties that the December 22 shipments were not made under any CSA–that rather, they were made pursuant to an oral agreement independent of the CSAs. So naturally the question arises: what bearing does Commodities' breach of its oral agreement with CIT have on the CSAs, and Commodities' power to terminate them upon Black Diamond's bankruptcy and claim termination payments and liquidated damages? CIT offers the following theory.

The CSAs, CIT correctly notes, contained a cross-default provision. That provision, 12(a)(v), a subsection of Section 12, the "Events of Default and Remedies" section of the CSAs, provided that the following acts were events of default under the CSAs:

> (v) the Party fails to pay or perform any obligation when due (after giving effect to any applicable cure periods) under any other transaction in the same Commodity between the Parties, which gives the non-Defaulting Party hereunder the right to terminate such transaction.

Doc. 117-4 at 14, Ex. 9. CIT reasons that the breach of the December 22 agreement falls under this provision, as follows. First, "the same Commodity" the provision refers to is coal, and the December shipments were shipments of coal, and thereby a "transaction in the same Commodity." Second, the December agreement was an oral agreement, not one made under the CSAs, and thus an "other transaction" covered by the provision. *Id.* All this is uncontroversial and conceded by Commodities. Third, CIT argues, Commodities' failure to pay for the December shipments gave Black Diamond the right to terminate the transaction.[3] Here the parties part ways.

CIT argues that Commodities' failure to pay gave Black Diamond the right to terminate the transaction because of an earlier subsection of the events of default section, 12(a)(i), which CIT claims "makes any payment default grounds for termination, on notice of 3 business days." Plaintiff's Opening Br. at 15. Therefore it follows that the oral agreement was terminable upon Commodities' failure to pay, after CIT gave Commodities notice of its late payment on February 4 and it did not pay by February 7. The problem with that argument is that that isn't what 12(a)(i) says. Section 12(a)(i), a subsection of the events of default section, provides that "the failure of the Party to make any payment required *hereunder* when due [on notice of three business days]" is an event of default that, under section 12(b), gives the non-defaulting party the right to terminate the *CSA*. Doc. 117-4 at 13, Ex. 9 (emphasis added). All it provides is that the failure to make a payment required under the CSA–which CIT concedes the payments for the December 22 invoices were not–makes the CSA itself terminable, not that it makes any given transaction terminable. So the argument is doubly wrong, both because 12(a)(i) only applies to payment defaults under the CSAs (if that were not the case, CIT would be arguing that 12(a)(i) itself rendered the late payments an event of default), and because 12(a)(i) only makes payment defaults grounds for termination of

---

[3] In so arguing, CIT concedes, as it must, that "which gives the non-Defaulting Party hereunder the right to terminate such transaction" is a restrictive clause that limits the universe of payment defaults that give rise to events of default to payment defaults that give rise to termination rights, not a clause that grants rights to terminate transactions outside the CSA.

15

the CSA, not grounds for termination of a given individual transaction under which a payment default arises.

CIT clearly knows this, because it next tries to argue that 12(a)(i) was incorporated into the December oral agreement. If 12(a)(i) really meant what CIT said it did, CIT wouldn't have to make that argument; 12(a)(i) would, by its own force, render the oral agreement terminable upon failure to pay. So, CIT argues that, since according to Mr. Hoskins's affidavit–the affidavit on which Commodities relies for its claim that the CSAs' sixty-day term was incorporated into the oral agreements–the oral agreements were "pursuant to the same non-commercial terms" as the CSAs, which were terminable upon payment default, it follows that the oral agreements were likewise terminable upon payment default. Plaintiff's Opening Br. at 15 n.10 (quoting R. 156 at 3, ¶ 7).

There is a serious irony in CIT's argument; the affidavit that it relies on to show that 12(a)(i) was incorporated into the December agreement is the affidavit Commodities relies on to show that the CSAs' payment term was incorporated into the December agreement. So if we were to give the decisive weight to Mr. Hoskins's affidavit that CIT thinks we should on the incorporation issue, CIT would have lost the case on the facts. When CIT discusses the affidavit's import on the issue of due date, it claims that Mr. Hoskins failed to assert that the December shipments were subject to all the non-commercial terms of the CSAs. Rather, it reads Mr. Hoskins, as does the Court, *supra*, to only make "the general statement that the parties' oral coal sale agreements were on the same non-commercial terms set forth in the [CSAs]." Plaintiff's Opening Br. at 12. If Mr. Hoskins's affidavit isn't evidence enough of the due date's incorporation into the December agreements, how is it evidence enough of 12(a)(i)'s incorporation into the December agreements? CIT never explains the inconsistency.[4] At the least, if there is a triable issue of fact as to whether the sixty-day term was incorporated into the December agreement, there is a triable issue of fact as to whether the CSAs' event of default provisions were incorporated into the December agreement. Indeed, while Mr. Hoskins expressly says in his affidavit that the sixty-day payment term was among the CSAs' terms incorporated into the oral agreements, he does not say that the event of default provisions were, and it is quite a stretch to assume that Mr. Hoskins's blanket reference to the CSAs' "non-commercial terms" includes the CSAs' events of default as well as the terms more naturally applicable to one-time shipments of coal, like payment and delivery terms.[5]

But the incorporation argument fails for a more fundamental reason; 12(a)(i) could not have been meaningfully incorporated into the December agreement. On December 22, as CIT does not dispute, Black Diamond delivered Commodities all the coal that was coming to it under the December agreement, fully performing its end of the bargain. Then Commodities failed to pay. Did that failure to pay give Black Diamond the right to terminate the transaction, as it must in order

---

[4] Perhaps CIT thinks that the evidence of an incorporated due date, unlike the evidence of incorporation of all the other CSAs' terms, is controverted by the invoices. But that doesn't suffice to explain CIT's inconsistent treatment of Mr. Hoskins's affidavit, because CIT not only argues that the affidavit is outweighed by other evidence of the due date, but that it says nothing about which terms were incorporated into the December agreement at all.

[5] Moreover, while we *know* that the sixty-day term was at least incorporated into all the oral agreements prior to December, there is no evidence at all, besides a very vague remark in Mr. Hoskins's affidavit, that the CSAs' events of defaults were.

16

for Commodities' failure to pay to be an event of default under 12(a)(v)? No, because as Commodities correctly argues, there was nothing left for Black Diamond to terminate. A fully performed agreement cannot be terminated. As New York's Uniform Commercial Code (which applies in this case) explains in its definition of termination, to terminate a contract is to discharge "obligations which are still executory on both sides," while "any right based on prior breach or performance survives." N.Y.U.C.C. § 2-106. *See also* Bryan A. Garner, Black's Law Dictionary (9th ed. 2009) (defining termination as the "act of putting an end to all unperformed portions of a conditional contract"). As between Black Diamond and Commodities, there were no obligations that were still executory on both sides; Black Diamond had already fully performed its obligations. So even if 12(a)(i) were incorporated into the December agreement, that agreement simply could not have been terminated *once* fully performed by Black Diamond. At most, had the agreement contemplated partial payment for partial performance, 12(a)(i)'s incorporation would have allowed termination of the agreement going forward if Commodities failed to make partial payment for partial performance.

CIT has two answers to this argument. The first is that 12(a)(i)'s incorporation into the oral agreements somehow rendered oral agreements terminable even after fully performed. The "express contract," it says, must trump New York law on termination. Plaintiff's Reply Br. at 19. There is nothing "express" about CIT's incorporation theory; it relies on an unmemorialized agreement to incorporate the CSAs' terms into oral agreements, the only evidence of which is an affidavit that CIT discredits on the very issue of incorporation. But even if 12(a)(i) were expressly incorporated into the December agreement, 12(a)(i) could not alter the meaning of termination; it could only create termination rights that would not otherwise exist. Commodities' argument is not, as CIT seems to think, that Black Diamond had no right to terminate breached oral agreements under New York contract law. Rather, CIT argues that once the December agreement was fully performed by Black Diamond there was nothing left to terminate, and that it is nonsense to speak of a right to terminate when termination is a legal impossibility. That argument is correct. One can no more terminate a fully performed contract than one can kill a dead animal. And one can no more sensibly talk about a *right* to terminate a fully performed contract than one can sensibly talk about a right to kill a dead animal. So unless CIT is arguing that 12(a)(i) redefined termination into a meaningless magic word that the parties could pronounce over fully performed contracts, *and* that 12(a)(v) used termination in this bizarre sense, its argument must fail. Of course, 12(a)(i) does not redefine termination; it defines payment defaults under the CSAs as an event of default, and 12(b), using termination in the normal sense, provides that the CSA may be terminated going forward upon, inter alia, the event of default described in 12(a)(i).

CIT's second answer, after having worked so hard to show that Commodities' late payment for the December shipments was an event of default under 12(a)(v), is that "it does not matter whether Commodities' failure to perform was itself an Event of Default." Plaintiff's Reply Br. at 19. How come? Section 12(a) of the CSAs provides that the listed events of default, like bankruptcies, would constitute events of default "[u]nless excused by . . . the other Party's failure to perform." Doc. 117-4 at 13, Ex. 9. Commodities, not having performed under the December agreement,

17

therefore could not declare an event of default. CIT doesn't seem to take this argument very seriously itself as it spends only two sentences on it, and for good reason; "the other Party's failure to perform," absent some express language to the contrary, could not possibly refer to the failure to perform under non-CSA agreements. The natural reading of the provision is that it refers to the failure to perform under the contract that provision is a part of. On CIT's reading of the language, grave breaches of the CSA would be excused by any breach of any other agreement between the parties. That cannot be right. When the parties wanted to extend the CSA's reach to transactions outside of the CSA, they did so expressly and perspicuously in 12(a)(v) ("any other transaction in the same Commodity between the Parties"), and they limited that reach to contracts long-term enough that they could be terminated.

## Conclusion

Because Commodities' failure to pay the December invoices was plainly not an event of default under the CSAs, nor an act that excused Black Diamond's default under the CSAs, all of the other arguments that the parties make are immaterial. We need not address whether Black Diamond or CIT waived the late payments, because whether or not either did, it could never affect Commodities' right to recoupment, nor need we address whether Commodities is right that even if the late payments were not waived, and even were they events of default, Commodities could still recoup. The Court grants summary judgment to Commodities on the ground that its failure to pay the December invoices was not an event of default or an act that excused Black Diamond's default, and reaffirms its holding on Commodities' ability to recoup the termination payments and liquidated damages.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Joe Lee*
**Bankruptcy Judge**
**Dated: Friday, June 28, 2013**
**(jl)**